### BOYER v. JOYAL.

CONTRACTS—EXPRESS AND IMPLIED AGREEMENTS—EVIDENCE—INFANT.

It was error to direct a verdict for defendant, in an action of assumpsit for the support and education of defendant's daughter, which plaintiff testified that he provided on the assurance of defendant that plaintiff should be repaid.[1]

Error to Houghton; Streeter, J. Submitted January 16, 1911. (Docket No. 87.) Decided March 13, 1911.

Assumpsit by Nobert Boyer against August Joyal for support provided the defendant's daughter. A judgment

---

[1] As to implied contract to pay for services to relative not living as part of same family, see note in 1 L. R. A. (N. S.) 819.

for defendant on a verdict directed by the court is reviewed by plaintiff on writ of error.    Reversed.

*O'Brien & Legendre,* for appellant.

*Louis N. Legris,* for appellee.

HOOKER, J.    Boyer and Joyal, the parties to this action, were neighbors.    Eighteen or twenty years ago the latter's wife died, soon after giving birth to a daughter. Boyer and Father Mesnard, a priest, had a talk about the baby, and later some one brought the child to Boyer's home, where she was received and cared for and educated. A few years ago she left Boyer's, and went to living at her father's.    The plaintiff brought this action to recover compensation for her support and was defeated; the jury rendering a verdict against him by direction.    Error is assigned upon such direction.

Court and counsel seem to have been of the opinion that no promise to pay for a child's support, where it was taken into a family and supported, could be implied, so construing the case of *Thorp* v. *Bateman,* 37 Mich. 69 (26 Am. Rep. 497).    Without intending to approve such a construction of that case, we must dispose of this case upon the record as made, and ascertain whether there was any evidence of an express contract to go to the jury.

Boyer testified:

" Now, later on, that baby was brought to my home. I couldn't say whether they brought it home.    I remember the night I was home the child was in the cradle.    I couldn't say who brought it to the house.    It was this baby of Mr. Joyal's, August Joyal's, and her name is Parmillia Joyal.    I had a conversation or talk with Mr. Joyal about five or six months after that.    I had no talk with him preceding this time.    I had a talk five or six months after, because the child, the little girl, took sick.    So me and my wife we had a talk together, and we said we ought to send for the father, because we won't leave the child die on our hand; we would notify him.    I sent for Mr. Joyal, and he came to my house, and I had a doctor for the child; the child was pretty sick.    The talk I had with Mr.

Joyal at that time; the baby was sick, and my wife crying on account of the child. She was pretty sick. She had pretty good care, and we were afraid to lose it, and we thought Mr. Joyal come over there to the house, and he see the child. So he says, 'Boyer,' * * * he said, 'try to get the best care you can for my child; try to bring it over again.' He said, 'If you brought it over again, I will pay you well some day for to take care of the child.' I says, 'All right, Mr. Joyal, I will try the best I can.' * * * During the 11 years he was living there I saw him often. I see him most every day. Yes, he was at my house. Sure, I had talks with him after that. He always talk about his child; about the little girl.

"*Q.* What did he say? What were some of his talks? Can you remember any particular time?

"*A.* The particular time was about two or three times a week sometimes. He would be at the house. If he didn't come to the house, he ask, 'How is the child? How is the baby?' * * * Before he moved away, I had talks with him about the child during the 11 years he was there.

"*Q.* How often did those talks occur?

"*A.* Many times; about 10 or 15 times. The nature of the talk was about the child. Take care of the child.

"*Q.* Can you name any particular month or any particular week during the 11 years, or particular year, you had a talk with him?

"*A.* During the year I can't tell. During the time we talked some of the time.

"*Q.* What was the nature of those talks?

"*The Court:* He has answered that question. They were about the child.

"*Q.* What was said about the child?

"*A.* Because I was raise up his child, I will be paid for it. He told me he will pay me for it, because I raise up his child. That's what was the talk about when we talk about the child. That's the only talk we had. I raise up the child because I expect to get pay for it."

On cross-examination he said:

"No, when I first took that child into my family, I did not want the child. I did not adopt that child and raise her up, as though she were mine. Yes, I testified on the previous trial of this case.

"*Q.* You testified that on one or two occasions Mr. Joyal had said that he would pay you well for the services?

"*A.* Yes, he did.

"*Q.* You never testified on that trial that you expected pay for the child, did you?

"*A.* Yes, sir; I always expect to get pay for it."

No testimony was offered on the part of the defendant. The court interpreted the first talk as having reference to the sickness only. We are of the opinion that the whole testimony should have been left to the jury to say whether the arrangement was that the service was to be paid for, or, on the other hand, was a voluntary taking of the girl as one of his family, a sort of adoption, without offer or promise of compensation. See 29 Cyc. p. 1611, and notes.

The judgment is reversed, and a new trial ordered.

OSTRANDER, C. J., BIRD, MOORE, and McALVAY, JJ., concurred.