GUILMET *v.* CAMPBELL

OPINION OF THE COURT

1. PHYSICIANS AND SURGEONS—CONTRACT TO CURE.

A physician or surgeon may bind himself by express contract to perform a cure or obtain specific results by treatment or an operation.

2. CONTRACTS—TERMS OF CONTRACT—EVIDENCE—JURY QUESTION.

The terms of a contract, when contested, are for the jury's determination, even when the evidence of the terms is uncontradicted.

3. CONTRACTS—FINDING OF FACTS.

What was said, and the circumstances under which it was said always determines whether there was a contract at all and, if so, what it was and these matters are always for the determination of the fact finder.

4. PHYSICIANS AND SURGEONS—CONTRACTS WITH PATIENTS—FINDING OF FACTS.

The qualitative difference between the relationship of a physician and his patient and the relationship between a shopkeeper and his customer is a significant circumstance the fact finder must remember in assaying their respective words of undertaking in entering into a contract with respect to their relationship so that a breach thereof will give rise to a cause of action.

---

REFERENCES FOR POINTS IN HEADNOTES

[1, 5, 10]  41 Am Jur, Physicians and Surgeons §§ 104–106.
[2, 3]  53 Am Jur, Trial §§ 254, 266–270.
[4, 6, 11, 12, 14]  41 Am Jur, Physicians and Surgeons §§ 71, 105, 141.
[7, 8]  53 Am Jur, Trial §§ 1063, 1131, 1141.
[9]  53 Am Jur, Trial § 1004.
[13]  58 Am Jur, Witnesses § 860 *et seq.*
[15, 16]  41 Am Jur, Physicians and Surgeons §§ 96–98.
[17]  29 Am Jur 2d, Evidence §§ 4, 10.
[18]  17 Am Jur 2d, Contracts §§ 365, 441, 443–447.

5. Physicians and Surgeons—Contracts—Personal Services—Contract to Cure—Evidence.

As in all contract cases for personal services, in order to find for the plaintiffs, a husband and his wife who sued the defendant-doctors on a count for breach of contract in regard to an operation on the husband, the jury must have found from the evidence that the doctors made a specific, clear and express promise to cure or effect a specific result which was in the reasonable contemplation of both themselves and the plaintiff-husband which was relied upon by the plaintiff-husband.

6. Physicians and Surgeons—Contracts with Patients—Offer—Acceptance—Damages—Jury Question—Judgment Notwithstanding Verdict.

Trial court, under the circumstances disclosed by the record, was correct in sending a case to the jury to determine the offer, acceptance, breach and damages, and refusing to grant judgment notwithstanding the verdict, where a husband and his wife sued the defendant doctors on a count for breach of contract in regard to an operation on the husband.

Opinion Concurring in Affirmance
Adams, T. E. Brennan, and Williams, JJ.

7. Trial—Contracts—Breach of Contract—Assumpsit—Trespass—Jury—Verdict—General Verdict—Court Rule.

*While it was proper for a jury, in a general verdict, to return separate findings upon two counts—assumpsit and trespass—it was not proper for it to return special or separate verdicts on the various specifications of breach of contract as a court rule provides for the submission of a cause to a jury on special issues and in all other cases a jury verdict is a general verdict (GCR 1963, 514).*

8. Trial — Verdict — Special Verdict — Negligence — Contracts — Court Rule.

*Trial court's oral question from the bench as to whether the jury found no negligence did not constitute a special verdict under a court rule and it did not control or limit the general verdict on the contract count, where defendant-surgeons were charged with both breach of contract and malpractice (GCR 1963, 514).*

9. Trial—Verdict—Contracts—Negligence.

*Verdict merely constituted a finding of no cause for action on the negligence count of plaintiff's complaint and a verdict*

*for the plaintiff upon the contract count where the foreman of the jury stated that the verdict was "no negligence" and breach of contract.*

10. PHYSICIANS AND SURGEONS—PRESUMPTIONS—MEDICAL ASSURANCES—CONTRACT TO CURE.
*The law should indulge every presumption that a physician's medical assurances do not constitute a contract to cure.*

DISSENTING OPINION

BLACK, J.

11. PHYSICIANS AND SURGEONS—CONTRACTS—DAMAGES.
*There is no proffered authority or precedent holding that a surgeon, said as having contracted to accomplish what none but the Great Maker could perform, may be held to respond in damages for having failed to provide it.*

12. PHYSICIANS AND SURGEONS—NEGLIGENCE—MALPRACTICE—CONTRACTS—BREACH.
*Trial transcript discloses that plaintiffs made out no submissible case of negligent malpractice against surgeons under rules often laid down and it further discloses that the testimony of plaintiff-husband, taken at its best, failed to make out a submissible case under the contract count of his pleading, as his testimony did not support any "contract" theory of recovery, that theory being breach occasioned exclusively by negligence.*

13. WITNESSES—WITNESS FOR PARTY—CREDIBILITY.
*Plaintiffs vouched for the credibility of a person sworn as their witness.*

14. PHYSICIANS AND SURGEONS—NEGLIGENCE—CONTRACTS—BREACH—ESOPHAGUS—EVIDENCE—SCINTILLA—INFERENCE.
*There simply was no proof, or scintilla out of which any permissible inference of actionable practice could be drawn, that the defendant-surgeons were negligent in performing an operation, or that they were guilty of breach of contract by performing the operation in an unworkmanlike, unprofessional and unskilled manner thereby injuring and perforating plaintiff's esophagus.*

15. PHYSICIANS AND SURGEONS—OPERATIONS—STANDARD OF PRACTICE.
*There was no showing whatever that the procedure in an operation was done other than in accord with regularly accepted medical practice where a "clip" of minute size and made of*

*silver was applied to plaintiff-husband's vagus nerve after the latter had been snipped off as a necessary part of a gastric resection, the permanent purpose being to adjust and control the discharge of gastric juices into the radically reduced size and gastric functioning of the remaining part of the stomach.*

16. PHYSICIANS AND SURGEONS—OPERATIONS—COURTS.

*No court may or can force a surgeon to perform an operation he deems risky both for the patient personally and for himself legally.*

17. EVIDENCE—PRIMA FACIE CASE—WORDS AND PHRASES.

*A prima facie case is defined as a case made out by proper and sufficient testimony; one which is established by sufficient evidence and can be overthrown only by rebutting evidence adduced on the other side.*

18. CONTRACTS—BREACH—NEGLECT TO PERFORM—OMISSION TO PERFORM—REFUSAL TO PERFORM.

*There is no way whereby a man may breach a contract another avers he has made excepting (a) by neglect of performance, or (b) by omission or refusal of performance.*

Appeal from Court of Appeals, Division 2, Quinn, P. J., and McGregor and V. J. Brennan, JJ., affirming Oakland, Clark J. Adams, J. Submitted May 5, 1970. (No. 2 April Term 1970, Docket No. 52,412.) Resubmitted January 7, 1971. (No. 9, January Term 1971, Docket No. 52,412.) Decided July 7, 1971.

16 Mich App 322 affirmed.

Complaint in counts of breach of contract and negligence by Richard A. Guilmet and Dorothy A. Guilmet against Kenneth N. Campbell and Joseph A. Arena for damages incurred as the result of a surgical operation performed by defendants. Verdict and judgment for plaintiffs on breach of contract count. Motion for judgment *non obstante veredicto* or for new trial denied. Defendants ap-

pealed to Court of Appeals.  Affirmed.  Defendants appeal.  Affirmed.

*Condit, Denison, Devine, Porter & Bartush,* for plaintiffs.

*Patterson & Patterson, Barrett, Whitfield, Manikoff and White (Robert G. Waddell,* of counsel), for defendants.

T. G. KAVANAGH, J.  This appeal presents a very simple question but it is fraught with great danger to the public weal.

The question is: Was the trial court in error in refusing to grant defendant's motion for a judgment notwithstanding the jury's verdict for the plaintiffs?

The defendants are skilled surgeons who performed a relatively complicated operation on plaintiff Richard Guilmet, and after such operation the plaintiffs suffered very great damages.

The danger attendant upon decision here is that on one hand if we sanction the award of damages to the plaintiffs we may foster suits which threaten the freedom physicians and surgeons must have in the practice of their vital profession, and on the other hand if we deprive these plaintiffs of their award, we not only may do them an injustice but impair the very process by which we seek to administer justice.

The facts and circumstances giving rise to the suit are as follows:

In the fall of 1963 the plaintiff had suffered near fatal bleeding through a peptic ulcer.  At that time he was being treated by Dr. Klewicki and it was Dr. Klewicki who recommended the defendant surgeons.  In January of 1964 the plaintiff went to see

the surgeon " * * * curious about an operation, if I should have one or if I shouldn't have one * * * ". It was never indicated to the plaintiff that he *must* have the operation.

Defendant Dr. Campbell testified that prior to the operation the plaintiff was in excellent physical condition and the operation was *not* an emergency.

At the first consultation with the defendant, Dr. Campbell, the following conversation took place according to the plaintiff's testimony:

"*Q*. Now what was the nature of the conversation? Did you state your purpose in being there?

"*A*. Yes, I asked Dr. Campbell—I was curious about an operation, if I should have one or if I shouldn't have one, I told him. He knew of my records. I started to tell him about my records. He said, 'I know all about your records.' I said, 'Fine.' He told me, he said, '*Once you have an operation, it takes care of all of your troubles,*' and he said, '*You can eat as you want to, you can drink as you want to, you can go as you please.*'

"*Q*. This type of operation we are talking about then is a stomach or an ulcer operation, is that right?

"*A*. Yes, it is.

"*Q*. Did you talk with him at all about his familiarity with this type of operation or the extent of the operation?

"*A*. Yes, I did.

"*Q*. What was the conversation as you recall it?

"*A*. Well, he explained to me how they do this operation, and at that time he told me that him and his associate, Dr. Arena, were specialists, *and there was nothing to it at all. It was a very simple operation according to them.*

"*Q*. Did he talk at all about whether he had performed these before?

"*A*. Yes, he did.

"*Q.* And what was the conversation along those lines?

"*A.* I asked him how often. He said, '*Very often.*'

"*Q.* Any discussion as to complications or problems that may arise, that may result?

"*A.* I asked him about it, how long I'd be out of work. He said, 'Approximately *three to four weeks at the most,*' and I asked him about any complications, anything dangerous. He said, '*No, there is no danger at all in this operation.*'

"*Q.* Was there any discussion as to where it would take place, how long you'd be convalescing in the hospital?

"*A.* He said 'Beaumont Hospital.' I'd probably be in four to five days and *then I'd be off work maybe another two to three weeks.*

"*Q.* You say he was familiar with your background. Was he aware that you were taking various medications, Maalox and things of this nature?

"*A.* Yes, he was.

"*Q.* You had been taking these pills for a number of months, had you not?

"*A.* Yes, I had.

"*Q.* What was the discussion about the future use of medication?

"*A.* Well, he said, '*after this operation, you can throw your pillbox away, your Maalox you can throw away,*' and then he come up with an example.

"*Q.* Give the example.

"*A.* The example was that '*In twenty years if you could figure out what you spent for Maalox pills and doctors calls, you could buy an awful lot. Weigh it against an operation.*'

"*Q.* Was there any conversation with him as to operations he had performed on other individuals who had treated for a while?

"*A.* Yes. He told me, he never mentioned no names. He just told me of a gentleman that he knows treated for an ulcer thirty years and he went

in, had this operation, *and he is altogether a. different man at this time.*

"*Q.* Now at the time of the conversation were you back to work?

"*A.* Yes, I was." (Emphasis added.)

Following this conversation the plaintiff Richard Guilmet underwent the operation.

The record contains a stark description of the troubles that thereafter befell him.

The record description of the vagotomy reveals activity around and on the esophagus. On March 4, 1964 the day following the operation Dr. Wood— a specialist in thoracic surgery on the staff of Beaumont Hospital examined plaintiff and diagnosed: "Ruptured esophagus due to surgical trauma in doing the vagotomy with bilateral effusion and mediastinal emphysema and mediastinitis." Dr. Wood testified that the symptoms displayed by the patient would cause him concern, that the mortality rate from a ruptured esophagus is 50% to 75%.

After the original operation plaintiff went through three subsequent operations for the insertion of tubes to drain excess fluid from his body; he suffered hepatitis which the defendant Dr. Campbell thought was probably caused by one of the many pints of blood he had been given; due to plaintiff's constant coughing and vomiting when eating, his weight fell from 170 pounds to 88 pounds and he was unrecognizable; he was unable to sleep due to coughing and only a return to the hospital and insertion of a drainage tube enabled him to sleep; and finally, he is scarred badly from the operations; he is unable to hold down two jobs as he once could; he is physically weak and unable to be athletically or socially active, and Dr. Wood

testified that it is not unusual for recurrences of one of his infections as long as 20 years later.

The plaintiffs brought suit for their damages in a two count complaint. One count asserted negligence on the part of the defendants in performing the operation, and the other count charged a breach of contract saying:

"4. That in January of 1964, Plaintiff, Richard A. Guilmet, for good and valuable consideration, entered into an agreement with Defendants to perform an operation known as a gastric resection upon Plaintiff and to administer subsequent post-operative care; that thereupon Defendants in furtherance of their contract jointly undertook to examine, diagnose, treat and operate upon and care for Plaintiff so as to cure him of the stomach disorder from which he was then suffering."

At the conclusion of proofs, overruling a defense motion for a directed verdict, the trial court sent the case to the jury and stated in his ruling:

"Turning to the matter of contract, it is true that Plaintiff Richard Guilmet, in his testimony, direct testimony, said that he talked with Dr. Campbell and Dr. Campbell said the operation would take care of all his troubles, and he could do as he pleased afterwards; that it was a simple operation, said that he performed it very often and he would be out of work four weeks and there was no danger.

"Now again, this Court would doubt whether those statements were all made, particularly after having listened to the Doctor, and while it is true that the Doctor is not required to guarantee his work, I suppose there is no reason why a medical doctor can't do that if he wishes, as well as any other person, so there is testimony here from which the Jury might reasonably infer that a contract was made to do these things as Mr. Guilmet testified, and I guess Dr. Campbell would be the first to

admit that it was far more than four weeks before this man did go back and there must be a great danger involved as a matter of practical fact, and that apparently the Plaintiff, Mr. Guilmet, has not been able to throw away his pill box since he recovered.

"Well, the record indicates, according to my notes that Plaintiff Richard Guilmet had a conversation with Dr. Campbell prior to the operation, and that Dr. Campbell said that the operation would take care of all troubles and that he could go as he pleased afterwards, and it would be a simple operation; that he had performed many before and that the Plaintiff would not be out of work more than four weeks, there was no danger, and he'd be in the hospital four to five days, and he could throw the pill box away after the operation, and told of other successful operations. \* \* \* *if this be the conversation and if the Jury accepts it, they would be in position to conclude that this Defendant Doctor had assured the plaintiff of the success of his operation, and having failed in that respect, they would be liable for damages.*" (Emphasis added.)

The jury returned a verdict of "no negligence" on the tort count but awarded the plaintiffs $50,000 on the breach of contract count.

Following this verdict the defendants moved for judgment notwithstanding the verdict, and the trial court denied it.

This decision was affirmed by the Court of Appeals and we granted leave in light of our conviction that it raised questions of the indicated significance to the jurisprudence of this state.

The defendants argue on appeal that "to establish a *special* contract to effect a cure plaintiff must prove a clear and enforceable promise, within the contemplation of the parties, supported by a *special* consideration, followed by reliance." (Emphasis added.)

The distracting aspect of casting the question thus is that the plaintiffs never asserted a "special contract".[1] They claim, on the contrary, that the observations and descriptions of the result which the defendant made were promises to achieve that specific end, and were inducements upon which plantiff, Richard Guilmet, relied in proceeding with the operation. They characterize it as an undertaking to "cure" him of the stomach disorder from which he was then suffering.

This appellation of "cure" may be unfortunate.

The parties when contracting never used the word "cure" and the mere elimination of a troublesome condition may not always be properly so designated. For example, a headache may be eliminated by decapitation but no one seriously suggests that it is a "cure." Similarily the substitution of a different stomach disorder for a specific one is not properly called a "cure" of the original ailment.

The gravamen of the plaintiffs' breach of contract complaint is that: 1) The following is the gist of what the defendants told him:

---

[1] In this state, a doctor is free to contract as he sees fit. He may or may not warrant the results of his treatment. He may do so as a term of the contract or as a separate contract subsequent to the original contract. (*Stewart* v. *Rudner* [1957], 349 Mich 459.) But in this case the warranties were prior in time to the acceptance and thus did not, as there, present a question of "past" consideration. Inapposite is *Gault* v. *Sideman* (1963), 42 Ill App 2d 96 (191 NE2d 436) wherein the Illinois court held the complaint did not sound in contract and observed "Attention has been called by (*sic*) courts to the fact that a promise to cure is not made by a competent and honorable physician and that such a physician knows that he cannot warrant a cure." In addition to the obvious distinction between the cases, the quoted observation (whatever its validity) sheds little light on the question here involved as to whether or not such a promise was made.

It is well settled that a physician or surgeon may bind himself by express contract to perform a cure or obtain specific results by treatment or an operation. 41 Am Jur, Physicians and Surgeons, § 105, p 220.

"Once you have an operation it takes care of all your troubles. You can eat as you want to, you can drink as you want to, you can go as you please. Dr. Arena and I are specialists, there is nothing to it at all—it's a very simple operation. You'll be out of work three to four weeks at the most. There is no danger at all in this operation. After the operation you can throw away your pill box. In twenty years if you figure out what you spent for Maalox pills and doctor calls, you could buy an awful lot. Weigh it against an operation."

2) That this amounted to an offer of a contract to achieve by the operation the condition described.
3) That in reliance on the description, the plaintiff accepted the offer, and in breach of the contract the condition described did not result.

In effect by their motion for judgment N.O.V., the defendants ask the court to rule as a matter of law that such statements by defendant *before the parties had contracted for the operation* as to the danger, convalescence, and result can *not* be regarded as a term of a contract between a physician and his patient.

This we will not do for we agree with Mr. Justice COOLEY when he said:

" * * * where the terms of a negotiation are left to oral proofs, the question what the parties said and did, and what they intended should be understood thereby, is single and cannot be separated so as to refer one part to the jury and another part to the judge; but in its entirety the question is one of fact. *Strong* v. *Saunders* [1867], 15 Mich 339; *Maas* v. *White* [1877], 37 Mich 126; *Estate of Young* [1878], 39 Mich 429; *Engle* v. *Campbell* [1880], 42 Mich 565."
*McKenzie* v. *Sykes* (1882), 47 Mich 294, 295, 296.[2]

2 See also *Beebe* v. *Koshnic* (1885), 55 Mich 604, 606, wherein Mr. Justice COOLEY stated: "The question what oral contract parties have made is not for the court, but for a jury * * * ."

We hold that the terms of a contract, when contested, are for the jury's determination. This is true even when the evidence of the terms is uncontradicted. See *Boyer* v. *Joyal* (1911), 164 Mich 662.

We recognize that what we hold is sometimes made clearer by stating what we do not hold. Here we do not say that everytime a doctor says to his patient prior to the formation of their contract for example, "I recommend an immediate appendectomy. It will fix you up fine. You will be back at work in no time. Do not worry about it—I have done hundreds of these operations. It is really a very simple thing." It may be said that he contracted to "cure" his patient.

What we are saying is that under some circumstances the trier of fact might conclude that a doctor so speaking did contract to "cure" his patient.

What was said, and the circumstances under which it was said always determines whether there was a contract at all and if so what it was. These matters are always for the determination of the fact finder. (*Strong* v. *Saunders, supra.*)

Justice TALBOT SMITH in *Stewart* v. *Rudner* (1957), 349 Mich 459, 467, 468 articulated our concern for the sensitivity of this area of engagement, when he said:

"A doctor and his patient, of course, have the same general liberty to contract with respect to their relationship as other parties entering into consensual relationship with one another, and a breach thereof will give rise to a cause of action. It is proper to note, with respect to the contracts of physicians, that certain qualitative differences should be observed, since the doctor's therapeutic reassurance that his patient will be all right, not to worry, must not be converted into a binding promise by the disappointed or quarrelsome."

This sound counsel, however, should not be read to import a different standard to this relationship than to any other. It merely stresses the importance of circumstances in determining the effect of words in establishing a contract. The qualitative difference between the relationship of a physician and his patient and the relationship between a shopkeeper and his customer is a significant circumstance the fact finder must remember in assaying their respective words of undertaking.

In this case the trial judge instructed the jury in part:

"Now, on the other hand, the two doctors take the position first of all, that they did not enter into a contract to effect a cure or a result, but that they only agreed to perform with such degree of care and knowledge and attention as is ordinarily possessed by practitioners of their profession under like circumstances. In other words, *they say that they did not assure to the plaintiffs any cure or specific result,* * * * ". (Emphasis added.)

As in all contract cases for personal services, in order to find for the plaintiffs here the jury must have found from the evidence that the doctors made a specific, clear and express promise to cure or effect a specific result which was in the reasonable contemplation of both themselves and the plaintiff which was relied upon by the plaintiff.

The plaintiffs say they did, the defendants say they did not.

We conclude that under the circumstances disclosed by this record the trial court was correct in sending this case to the jury to determine the offer, acceptance, breach and damages, and refusing to grant judgment notwithstanding their verdict.

As did the Court of Appeals, we affirm.

Plaintiffs may tax costs.

T. M. KAVANAGH, C. J., and ADAMS, SWAINSON, and WILLIAMS, JJ., concurred with T. G. KAVANAGH, J.

T. E. BRENNAN, J. *(concurring in affirmance)*. Plaintiff sued on two counts, one in assumpsit, alleging breach of contract, one in trespass, alleging malpractice.

While it is true that in the contract count, plaintiff alleged that the defendants agreed to cure his ulcer, it is also true that the contract count contained allegations that defendants agreed to perform the operation in a good and workmanlike manner, and contained a number of other specifications of professional negligence, all of which were alleged to have constituted breach of contract by the defendants.

Count I, the contract count, contained the following:

"4. That in January of 1964, Plaintiff, Richard A. Guilmet, for good and valuable consideration, entered into an agreement with Defendants to perform an operation known as a gastric resection upon Plaintiff and to administer subsequent post-operative care; that thereupon Defendants in furtherance of their contract jointly undertook to examine, diagnose, treat and operate upon and care for Plaintiff so as to cure him of the stomach disorder from which he was then suffering.

"5. That Defendants agreed as part of their employment to perform said operation in a good and workmanlike manner; that as specialists in surgery they would cure Plaintiff by said operation and that Plaintiff would be able to leave the hospital in a short time and resume his occupation and normal family life.

"6. That Plaintiff duly performed all the terms and conditions of the agreement to be performed on his part; and thereafter on or about February 27, 1964, at Beaumont Hospital, Royal Oak, Michi-

gan, Defendants, in pursuance of their agreement, placed Plaintiff under anesthetic and undertook to perform the operation herein referred to.

"7. That Defendants in the course of said operation and in breach of their contract, in an unworkmanlike, unprofessional and unskilled manner, injured and perforated Plaintiff's esophagus, a heretofore healthy part of his body which required no treatment.

"8. That Defendants in further breach of their contract, failed to timely diagnose and ascertain the aforementioned damage and to promptly and properly remedy their unskilled performance by proper operative and post-operative examination and treatment; that Defendants' post-operative procedures, particularly the oral administration of food and liquid which passed through the perforation in Plaintiff's esophagus into his chest cavity thereby causing aggravation and infection, was contrary to Defendants' agreement to exercise care and skill in administering to Plaintiff.

"9. That Defendants in further breach of their contract carelessly deposited and left a clamp within Plaintiff's abdomen.

"10. That Defendants in further breach of their contract failed to advise Plaintiffs of the risks involved and serious consequences attendant to said operation and failed to achieve satisfactory results.

"11. That Defendants wrongfully misrepresented to Plaintiffs and concealed from them the injury to Plaintiff's esophagus and their careless and negligent acts in said operation as well as the extent of the surgery performed and the permanent and serious nature of the injury resulting from their treatment."

The cause was tried and submitted to the jury on both counts. At the conclusion of its deliberations, the jury returned and the following took place:

"(The jury, having completed their deliberations, returned to the courtroom.)

"Jury roll called.

"*The Clerk:* Members of the Jury, have ten or more of you agreed upon a verdict? If so, let your Foreman speak.

"*Foreman:* Yes, we have.

"*The Clerk:* What is the verdict of the Jury?

"*Foreman:* The verdict of the Jury is that on the Count of malpractice, not guilty. On breach of contract, guilty.

"*The Court:* The word of 'guilty' is not used except in criminal matters. Is it your finding that you found no negligence?

"*Foreman:* Yes.

"*The Court:* The finding of the Jury is no negligence?

"*Foreman:* That's correct.

"*The Court:* You find breach of contract?

"*Foreman:* That's right. Correct.

"*The Court:* What did you assess by way of damages?

"*Foreman:* Fifty thousand.

"(Jury sworn as to verdict.)

"*The Court:* Do either Counsel care to have the Jury polled?

"*Mr. Whitfield [attorney for defendants]:* Please, your Honor.

"(Jury polled by the clerk.)

"*The Court:* Ladies and Gentlemen, that concludes the trial of this cause.

"(At this time the jurors left the courtroom.)"

My Brothers have interpreted this verdict as constituting a finding that, without committing any of the acts of professional negligence alleged, the defendants were nonetheless liable upon a breach of a contract to effect a cure.

I do not so read the verdict of the jury.

While it was proper for the jury to return separate findings upon the two counts—assumpsit and trespass—it was not proper for the jury to return

special or separate verdicts on the various specifications of breach of contract.

GCR 1963, 514 provides for the submission of a cause to a jury on special issues. In all other cases a jury verdict is a general verdict.

The jury verdict here was a general verdict upon the breach of contract count, and did not, as my Brothers suppose, negate the existence of those acts of negligence which were charged as breach of contract.

The trial court's oral question from the bench, "The finding of the jury is no negligence?" did not constitute a special verdict under GCR 1963, 514. It did not control or limit the general verdict on the contract count.

The trial judge, throughout his instructions, referred to the assumpsit and trespass counts as "contract" and "negligence".

He was attempting to clarify the foreman's report that the verdict was "not guilty" as to malpractice and "guilty" as to breach of contract.

The only proper question the court could have been asking, and, in my opinion, the real purpose of his inquiry was—

"Do you find no cause for action as to the count of negligence?"

Properly considered, the verdict of the jury merely constituted a finding of no cause for action on Count II of the plaintiff's complaint (the trespass or negligence count) and a verdict for the plaintiff upon Count I of the plaintiff's complaint (the assumpsit or contract count).

This result is the more understandable when we consider that the trial judge severely limited the jury's consideration of Count II.

"Now although the plaintiffs in this cause have also claimed that the defendants failed to make timely diagnosis and failed to promptly and properly remedy plaintiff's post-operative complications by proper operative and post-operative examination and treatment, and also claim that the post-operative procedures, particularly the oral administration of food and liquid were careless and negligent and that the defendants carelessly and negligently deposited and left a clamp within the plaintiff's abdomen, and the defendants failed to advise the plaintiffs of the risks involved, and that the defendants failed to use the proper technique in the performance of the operation so as to not injure plaintiff's esophagus, and that the defendants failed to promptly call in consultants, let me say to you that the evidence does not disclose that their performance in these regards was not proper and in accordance with the medical standards of the community. Accordingly I direct that you disregard these claims and that they play no part in your deliberations as to whether or not the defendants were in fact negligent."

The trial judge did not similarly limit its consideration of the jury with respect to the allegations of Count I, and there is no reason here to assume that the jury did not find that the conduct of the defendants was "contrary to Defendants' agreement to exercise care and skill in administering to Plaintiff" as alleged in Count I.

In my view, the law should indulge every presumption that a physician's medical assurances do not constitute a contract to cure. The verdict here should be sustained, and can be sustained without encouraging such allegations in the future.

ADAMS and WILLIAMS, JJ., concurred with T. E. BRENNAN, J.

Black, J. (*dissenting*). In these early weeks of 1971 an exuberant new majority of a once great appellate court prepares to launch an unwarned, unprecedented, wholly gratuitous and destructively witless war of "contract liability" upon a brother profession which, by the multifold harassment of malpractice actions, has been forced already to undertake what is professionally known as "defensive medicine."[1] What the statewide impact will be, when today's majority opinion is released, is not difficult to foresee. The five Justices composing this new majority should be forgiven, for demonstrably they know not what they do to an old and indispensable relationship of reciprocal trust which the legal profession and the followers of Hippocrates have always identified as that of physician and patient.

When this case was submitted May 5 last year, the writer as then assignee under our system wrote for a majority. His opinion for reversal was submitted to the other Justices on May 21, 1970. It appears verbatim at the end of this 1971 dissent.[2] I stand by it today, just as last May. One endorse-

---

[1] Read "Suing the Doctor: A Rising Problem," US News & World Report, March 8, 1971 issue, pp 70–72:

"'Defensive medicine.' Doctors' fears of malpractice suits are adding heavily to medical bills across the nation.

"As doctors become more aware of the legal dangers they are running, they become increasingly cautious. They turn to a new—and expensive—kind of practice called 'defensive medicine.' "

The USNWR article portrays only what *is* thus far, in the area of *malpractice* litigation. The writer thereof knew naught of what in dismaying compound is due for the medical profession of Michigan and those it needfully serves. Fortunately elsewhere, not one high Court of *any* other State has gone so far as to affirm a "contract" judgment against an accused doctor where the jury has actually acquitted that doctor of negligent malpractice as charged.

[2] (June 21, 1971): The intervening multiplication of pagination of our 385th Report considered, I have decided to eliminate this demonstrative appendix and to advise all concerned counsel that copies thereof will be available upon request directed to me.

ment committed last year was eliminated by the progressive and then terminal illness of the late Justice HARRY F. KELLY. The other was eliminated by political action November 3.

Determination of the appeal was held in abeyance by Justice T. G. KAVANAGH, for preparation of an announced minority opinion. July 8 the Justice delivered to us an opinion proposing affirmance which, for reasons I think may be developed circumstantially, will *not* appear in our reports. Thereafter, with each of the two conflicting opinions bearing three signatures and awaiting Justice KELLY's hoped for recovery, we were compelled finally to enter our November 30 order for rehearing of a then deadlocked appeal. That order eliminated the votes of two Justices who, but for events starting June 1, would have participated in a reasonably prompt decision, last year. Thus does the precedential law of Michigan swing back and forth like a two year timed metronome.

When one writes for a majority he is inhibited. As Justice Cardozo wrote (Selected Writings of Benjamin Nathan Cardozo, Fallon Publications 1947, p 353), "Comparatively speaking at least, the dissenter is irresponsible. The spokesman of the court is cautious, timid, fearful of the vivid word, the heightened phrase." Then the Justice proceeded (same page): "Not so, however, the dissenter. He has laid aside the role of the hierophant, which he will be only too glad to resume when the chances of war make him the spokesman of the majority. For the moment, he is the gladiator making a last stand among the lions." (To which the writer must add that the gladiator, wielding his grimly honed claymore, usually begat a pretty fair lunch while the

wounded lions that managed to survive were getting almost as costly a meal.)[3]

Much more than this has been written about the chores of a dissenter. I prefer to say in present context that his duty is to warn a great unrepresented throng of directly concerned citizens, doctors and patients alike, that the hitherto dependable nature of a wholesome relationship is bound by this upcoming judicial decision to lose much if not all of its value, and that the bedside assuager may no longer lay that alleviating foundation for ordeal, as before. The patient and his consulted surgeon must each proceed hereafter at wary and worried arm's length, with words and writings chosen with care and recorded as a basis for the surgeon's advisory judgment, that is, whether to operate or not operate. I can think of no greater blow a Court may strike at what is needed most, confidence and mutual trust that is, when the sick must consult an operating specialist with view toward that kind of major surgery which no man may deny is fraught with peril, no matter how skilled the surgeon and no matter the perfection of his work.

*First: What is the Specific Nature of Our Divisive Issue?*

Plaintiffs, husband and wife, sued the defendant surgeons in separate counts for alleged breach of contract and malpractice, both charged as having arisen out of the same transaction and the same facts. The first count avers that the defendant surgeons for good and valuable consideration contracted with plaintiff Richard A. Guilmet to remove a portion of his stomach by "an operation known as

---

[3] The reader will understand that last year's opinion for reversal was, to satisfy a more kindly ordered Brother of our then majority, couched as Cardozo said was in accord with the proper role of the Court's "spokesman."

a gastric resection," that defendants performed the agreed operation "in an unworkmanlike, unprofessional and unskilled manner," thereby injuring "plaintiff's esophagus, a heretofore healthy part of his body which required no treatment," and that they were injured thereby to the tune of $365,000.

The second count, for malpractice, charged the defendants similarly excepting only that the breach of contract theory was omitted from that count. Thus the first count was pleaded *ex contractu* upon negligence and the second was pleaded *ex delicto* upon negligence. See full quotation, ante at pp 71, 72, of the "breach" paragraphs of count one of plaintiffs' complaint.

The pleaded issues were tried to a jury. The verdict of the jury specifically acquitted the defendants of negligence and found for the plaintiffs under the count *ex contractu,* in the amount of $50,000.

The *verdict* of the jury, and the *verdict* of today's majority with respect to the jury's verdict, expose with precise clarity that which on rehearing has become a simple and quite decisive issue. Here is the jury's verdict:

*"Foreman:* The verdict of the jury is that on the count of malpractice, not guilty. On breach of contract, guilty.

*"The Court:* The word 'guilty' is not used except in criminal matters. Is it your finding that you found no negligence?

*"Foreman:* Yes.

*"The Court:* The finding of the jury is no negligence?

*"Foreman:* That's correct.

*"The Court:* You find breach of contract?

*"Foreman:* That's right. Correct.

*"The Court:* What did you assess by way of damages?

*"Foreman:* Fifty thousand.

(Jury sworn as to verdict [also polled])   \*   \*   \*

*"The Court:* Ladies and Gentlemen, that concludes the trial of this cause."

Here is today's majority verdict, repeated for accentuation:

"The jury's verdict of 'no negligence' does not resolve the contract question.

"IF THERE WAS A CONTRACT TO EFFECT A CERTAIN RESULT IT DOES NOT MATTER WHETHER THE TREATMENT WAS DONE NEGLIGENTLY OR WITH CONSUMMATE SKILL. IF THE CURE WAS NOT EFFECTED THE CONTRACT WAS BREACHED."[4]

(I have put this last paragraph in full caps, that it may stand forth shamelessly naked before the courts of other states when they, predictably, are called upon to follow suit.)

As was noted last year, the "unworkmanlike, unprofessional and unskilled" language of count one manifestly was taken from, and plaintiffs' contract theory of recovery was planted upon, the most prominent authority cited by them. That authority is *Robins* v. *Finestone* (1955), 308 NY 543 (127 NE2d 330), a decision which came to review, not as here after trial and verdict but upon the defendant surgeon's motion to dismiss. His motion assigned New York State's two-year statute of limitations, applicable to non-contract actions, *as the sole basis of dismissal.* The New York Court of Appeals held only that the complaint stated a cause *ex contractu* against the defendant surgeon, thus bringing into play the state's much longer limitational statute.

---

[4] (June 21, 1971): Since the foregoing opinion of dissent was submitted to the Justices, this quotation of the then opinion for affirmance was deleted by means of a new opinion for affirmance. See "ADDENDA", *post* at p 94.

*There was no holding at all that the pleaded cause would hold up without proof and finding of the negligence charged in Mr. Robins' complaint.*

Hence, unlike last year, we are now definitely squared off for and against proposition that the jury's verdict, having absolved the defendants from negligence, wiped out plaintiffs' pleaded and tried theory that the alleged breach was committed by the specific acts of *negligence* that are charged as *breach* in plaintiffs' first count.

*Second: May These Plaintiffs Have Judgment Under the First Count, the Defendants Having Been Exonerated of Negligent Conduct as Alleged in that Count?*

My then as now negative answer, with reasons based particularly on the reasoning of cases decided in California, Illinois and Montana,[5] appears in the opinion submitted last May. As against this there is no pretense of proffered authority or precedent. My Brothers five just say "This is the law." That they do with an arrantly dixitized vengeance, for all of the skilled research clerks of Lansing, working with no surcease and without food or drink, never could come up with any kind of respectable or even plausible authority holding that a surgeon, said as having contracted to accomplish what none but the Great Maker could perform, may be held to respond in damages for having failed to provide it.

The affirming Brethren attest on their own that no matter the skill with which these unusually competent and experienced specialist surgeons went about a perilously developing and finally successful

---

[5] *Wilson* v. *Blair* (1922), 65 Mont 155 (211 P 289, 27 ALR 1235); *Marvin* v. *Talbott* (1963), 216 Cal App 2d 383 (30 Cal Rptr 893, 5 ALR3d 908); *Gault* v. *Sideman* (1963), 42 Ill App 2d 96 (191 NE2d 436).

task; that no matter they managed to save Mr. Guilmet's life by their efforts; that no matter the jury did find them not guilty of negligence, that these same specialists nonetheless "contracted" to provide—yes in "approximately three or four weeks at the most"—a "cure" for Mr. Guilmet's badly diseased and twice dangerously bleeding stomach and, having failed to have him "back at work" at end of that four week period, that they are due for mulct aggregating today more than $63,000.

Such is the announced rule of this case, no more and no less. Let it stand in our books for all to read, wonder and prepare either for more amercement of doctors or more "defensive medicine."

The policy and reasoning declared in the cited California, Illinois and Montana cases is not opposed by *Beebe* v. *Koshnic* (1885), 55 Mich 604, which last the Brethren standing for affirmance cite as authority for the proposition that today's issue of contract and breach became one of fact.

Let us examine the *Beebe* case. There the doctor was the *plaintiff*. His pleaded cause was one of *special* contract, supported by a *special* consideration, to effect a cure on the same basis as in *Hollywood* v. *Reed* (1884), 55 Mich 308, that is, "no cure, no pay." In view of our irreconcilably variant views of *Beebe,* hear Chief Justice Cooley tell us in steady—not conveniently expurgated—context what the nature of Dr. Beebe's cause was, and how the issue there came to this Court (pp 604, 605):

"Cooley, C. J. The plaintiff is a physician, and brings suit to recover compensation for services in curing the defendant of a disease of one of the defendant's legs. *It was a part of the plaintiff's case that he performed the services under a special agreement that he was only to be paid in the event of a cure.* He therefore took the burden of showing

that a cure had been effected." (Emphasis by present writer.)

I have read through, again this year, the 778 pages of this trial transcript. It discloses that the plaintiffs made out no submissible case of negligent malpractice under rules often laid down, strikingly applicable here, as in *Lince* v. *Monson* (1961), 363 Mich 135 and *Skeffington* v. *Bradley* (1962), 366 Mich 552. It discloses further that the testimony of Mr. Guilmet, taken at its best, failed to make out a submissible case under count one (the "contract" count) of his pleading. The reason is that his testimony did not support any "contract" theory of recovery, *that theory being breach occasioned exclusively by negligence.*

Read now all of the "breach" paragraphs of Mr. Guilmet's complaint:

"5. That Defendants agreed as part of their employment to perform said operation in a good and workman-like manner; that as specialists in surgery they would cure Plaintiff by said operation and that Plaintiff would be able to leave the hospital in a short time and resume his occupation and normal family life.

\*    \*    \*

"7. That Defendants in the course of said operation and in breach of their contract, in an unworkman-like, unprofessional and unskilled manner, injured and perforated Plaintiff's esophagus, a heretofore healthy part of his body which required no treatment.

"8. That Defendants in further breach of their contract, failed to timely diagnose and ascertain the aforementioned damage and to promptly and properly remedy their unskilled performance by proper operative and post-operative examination and treatment; that Defendants' post-operative procedures, particularly the oral administration of food and

liquid which passed through the perforation in Plaintiff's esophagus into his chest cavity thereby causing aggravation and infection, was contrary to Defendants' agreement to exercise care and skill in administering to Plaintiff.

"9. That Defendants in further breach of their contract carelessly deposited and left a clamp within Plaintiff's abdomen.

"10. That Defendants in further breach of their contract failed to advise Plaintiffs of the risks involved and serious consequences attendant to said operation and failed to achieve satisfactory results.

"11. That Defendants wrongfully misrepresented to Plaintiffs and concealed from them the injury to Plaintiff's esophagus and their careless and negligent acts in said operation as well as the extent of the surgery performed and the permanent and serious nature of the injury resulting from their treatment."

Consider the pleaded factual specifics distinguished from the legal conclusions that are set forth in the quoted paragraphs. One is declared by paragraph 7, the other by paragraph 9. Paragraph 7 declares that the defendants "perforated" Mr. Guilmet's healthy esophagus. Paragraph 9 declares that they left a "clamp" in his abdomen.

Take "7" first. Did the defendants "injure and perforate" Mr. Guilmet's esophagus? The claim was based in particular upon an entry in the hospital record made by Dr. Wood, a specialist in thoracic surgery, not abdominal surgery, some five days after the gastric resection was performed. Dr. Wood had been called into consultation by the defendants in view of Mr. Guilmet's then precarious condition. His entry reads:

"History and progress noted. X-ray today shows perforation of the lower esophagus—correction,

lower esophageal segment with large pneumothorax on the right and pleural effusion on the left."

Dr. Wood was sworn by plaintiffs as their witness. Unless our standing rules of evidence have changed, plaintiffs vouched for his credibility, which is not to suggest that there was anything incredible or doubtful about his testimony. It developed without shred of dispute, both by Dr. Wood's testimony and that of defendant Arena, that the noun "perforation" was used by customary medical parlance in its broad sense and that the hole in the lower esophagus, discovered some days after the operation as above, is known technically as a "spontaneous fistula." Hear Dr. Wood on this:

"*Q.* You have indicated a spontaneous fistula. Would you explain to the jury what the mechanics of such a thing might be?

"*A.* It usually occurs in a patient who has some vomiting for any particular reason. Vomiting with a large amount of gas in the stomach can suddenly balloon the esophagus beyond its stretching point and it splits. The esophagus is actually a rather weak structure. It has an inner lining called the mucosa and then a muscular coat but it doesn't have any covering on the outside as the rest of the intestinal tract has, and so it's a structure which does not have a great deal of strength and so it is possible for it to become perforated without a great deal of injury. I mean, a great deal of force let me say. So a patient that suddenly evacuates the contents of the stomach, if it be dilated with gas and fluid, can so perforate the esophagus. This would be called a spontaneous perforation of the esophagus and it is reported and has a syndrome attached to it."

Later, when the trial judge intervened by saying he did not hear a presented question, Dr. Wood responded:

"*Q*. Actually in reviewing the chart here, my question was going to be is it your opinion that this hole in the esophagus was created during this operation of the gastric resection?

"*A*. I didn't anticipate that question, your Honor. I would be of the opinion that the perforation in the esophagus occurred at some time subsequent to the actual operation. I stated before that if it occurred at the time of operation, the surgeon should see it. It is possible I think that either Levine tube or a situation at the time of surgery precipitated a subsequent perforation, several hours after. I don't know whether the patient vomited after or not, but vomiting or retching could well have produced a perforation some time after surgery, perhaps during the immediate post-operative period, awakening from an anesthesia.

"*Q*. At any rate, it is your opinion that it did not occur during the operation?

"*A*. I think that is what I said.

"*Q*. Is that your opinion?

"*A*. I think that it occurred subsequent to the operation."

It is enough to say that there simply was no proof, or scintilla out of which any permissible inference of actionable practice could be drawn, that the defendants were negligent as charged by quoted paragraph 7, or that they were guilty of "breach" as duplicitously charged in that paragraph. I suggest the Brothers five concede this when they say that the jury's verdict of "no negligence" did not absolve the defendant surgeons of and from the alleged contractual liability. Do they not say that the defendants must respond no matter the "consummate skill" of their surgical doings?

Now for quoted "9". This allegation was actually interred at the trial, when the trial judge considered the requests to charge with counsel. When chal-

lenged for proof plaintiffs' counsel admitted that
"clip" should have been employed in the place of
"clamp." Then this took place, with no objection on
the part of plaintiffs' counsel:

"*Mr. Condit* [*attorney for plaintiffs*] : I would
move to amend the complaint to substitute the word
'clip' for the word 'clamp.'

"*Mr. Whitfield* [*attorney for defendants*] : I again
suggest there is no evidence in the record that this
is not within the standard of care. In fact it was
testified to do this. It is intended with clips that
they be left in and there is no evidence to the
contrary.

"*The Court:* I will have to agree with you on
that."

A "clip" such as was applied to Mr. Guilmet's
vagus nerve, after the latter had been snipped off
as a necessary part of the main operation, is of
minute size and made of silver. Its *permanent
purpose* is to adjust and control—to the radically
reduced size and gastric functioning of the remain-
ing part of the stomach—the discharge of gastric
juices into that part. There was no showing what-
ever that this was done other than in accord with
regularly accepted medical practice.

*Third: A Look at the Consequences of Today's
Misfortunate Decision.*

From here on the surgeon contemplating a serious
operation will undertake knowingly a third and even
more menacing risk should he advise affirmatively.
The first of course is the ever sobering possibility
of sad or untoward results no matter his "consum-
mate skill" and the careful employment thereof.
The second is that crescently more perilous expo-
sure to a suit for negligent malpractice should the
result turn out funereal or misfortunate. And now
comes the third. It is this Court's newly invented

and retroactively granted right of suit against a surgeon upon simple allegation that the surgeon contracted to do that which none but the Deity could possibly agree to perform, that is, effect a "cure" or defined result when the scheduled treatment is surgical removal of a substantial part of an anatomical organ; an organ which, to sustain life beyond *extremis,* must continue to perform a daily function.[6]

Does not the complaint before us allege that the defendants entered into an agreement "to perform an operation known as a gastric resection"? Do the Brethren not realize that the recommended operation necessitated the excision of approximately 80% of Mr. Guilmet's stomach, and that the vagotomy of which so much has been made was but a vitally necessary preliminary to the plaintiff-pleaded gastric resection?[7]

One wonders why the minority affirmers of 1970, and now the majority affirmers of 1971, cannot see that their current opinion will not only create an easy new "breach of contract" way to sue physicians and surgeons for untoward or unforeseen results; that it will in addition open the doors of our courts to actions old and new so long as they pass six-year rather than two-year muster under MCLA § 600. 5807 (Stat Ann 1962 Rev § 27A.5807). Do the Brethren not perceive that the medics will go even

---

[6] Doubtless the medical profession cannot buy insurance protecting against this new kind of professional liability. And even if such insurance were obtainable, what now with *Guilmet* will be the cost thereof, superimposed as it must be over the cost of liability insurance against malpractice. See the previously mentioned USNWR article at p 70:
"The cost of malpractice insurance for doctors and hospitals has risen astronomically."

[7] Let me again, as done last year, provide an understanding of what a vagotomy is, distinguished from a gastric resection. Webster has given it, for at least the last 15 years, as the "Surgical division of the vagus nerve."

more "defensive" when this latest of our "forward-looking" decisions hits the precedential fan, and that many an operation that might have saved life will not be performed either of professional wariness or, more importantly, inability of the surgeon under new law to prepare his apprehensive patient mentally for the making of an affirmative decision?

It is natural for the sick, and the near kin of the sick, to seek anxiously for more and more medical assurance when the hour for surgical decision arrives. And when that decision is affirmative and the result turns out fatal, disabling or otherwise dismal, it is human to recall the doctor or doctors' preparational encouragement as misrepresentative or even promissory; certainly when money is brought into legal focus. There is the rub as one gazes at testimony that Dr. Campbell, the circumstances being what they were when Mr. Guilmet was suffering the second time from serious internal bleeding,[8] "promised to have the latter back at work in 'approximately three to four weeks at the most'."

Another curiosity: What will be contrived out of this case of *Guilmet* when, the presented case being exactly as at bar except only that the patient has died after administration of last rites, the patient's promise-oriented widow sues or attempts to sue as fiduciary under our distinctive wrongful death statute? Is not the tortious linchpin of that statute the exact same as was originally written by Lord Campbell, that is, death "caused by wrongful act, neglect or default"? Has not our unique since-1939 statute provided that "All actions for such death, or injuries resulting in death, shall be brought only

---

[8] To quote plaintiffs' brief: "As to these conversations appellee testified: 'I was in deep thought at that time of bleeding, I am bleeding to death in the woods, on the way home from work, some late night, and then he tells me that "Well if there is any more I can do for you, let me know." Well, I thought about it.'"

under this section." (MCLA § 600.2922 [Stat Ann 1971 Cum Supp § 27A.2922])?[9] What will we pronounce to be the measure of damages in such a case of *contracted cure,* when death results?

Still another for meditation is what our presently heady majority will do when an indignant client, having lost his case, insists in court on strength of *Guilmet* that his lawyer *promised* for consideration a damage verdict and judgment for no less than a given amount, or *promised* a decree saving the client's home from an allegedly unjust foreclosure or title-trap, or *promised* a successful action against that life insurer refusing to pay on allegation of medical fraud, or *promised* a successful contest of Grandpa's will, but did not come through. That will be a first class vexer for this Court to grant or deny when the contractual theory of *Guilmet* is advanced, yes against a lawyer; most certainly when the alleged promisor is a prominent member of the so-called plaintiffs' bar and *he* is nominated for condemnation in damages.[10]

Thus far there appears to the writer still another like bushment the Court should see but does not see, or perhaps is too absorbed to see, dead ahead. But what avails further attempt at persuasion when all caution has been cast aside for the big rush toward more punitive damage awards? In our present exuberance this *Guilmet* case has become a blind stampede toward another jurisprudential precipice. Hence anyone in the way had best head for the hills

---

[9] The preceding statutory provision, § 2921, really buttons this up: "Actions on claims for injuries which result in death shall not be prosecuted after the death of the injured person except pursuant to the next section."

[10] We have here even now a case which, had Guilmet been handed down a while back, might well have posed for monetary punishment a lawyer who recommended successfully the turndown during trial of an offer to settle for $27,500, only to hear the jury say later "no cause." See *Sifers* v. *Horen* (1970), 22 Mich App 351 and our order granting leave to review, 383 Mich 822.

of reasoned safety. Even a duty-bound dissenter cannot exhort too long, before stepping aside, lest he be run down or carried over the cliff with the rest.

*To Conclude:*

Is the above too gloomy? Not at all. Today in America there is a great and critically developing shortage of medical men. They already have too much to do, are stretching their hours the more, and are hardly interested in the assumption of more legal risks than they bear now. You see, Brothers all, no Court may or can force a surgeon to perform an operation he deems risky *both* ways, that is, risky for the patient personally and risky for himself legally. *Guilmet* will simply make him guardedly overcautious in the making of his most serious judgments, and that is not good for the public weal.

The doctor who cannot prepare and condition his patient, both mentally and physically for a *serious* operation, is crippled beforehand. So is the patient, only more so. What is recommended surgically becomes progressive Gethsemane for the patient unless the doctor can provide, as before, that "therapeutic reassurance" which Justice TALBOT SMITH so wisely preserved inviolate when he wrote our carefully narrowed opinion of *Stewart* v. *Rudner* (1957), 349 Mich 459, 468. But now with the threatening thrust of *Guilmet* the doctor must so hedge and guard his words (probably from now on with a tape recorder running) as to create more doubt and fear than ever in the patient's mind and, here and there, impel a desperate negative decision by the latter.

All else aside, the stark tragedy of this *Guilmet* precedent is that we Justices will never see or know anything about the hundreds and hundreds of negative decisions today's determination of "contract" liability will force upon the physician-patient rela-

tionship, both in the offices of medical consultation and in the hospitals of Michigan. Nor will we ever know about those predictably fewer cases where, more than true to their Hippocratic oath, the specialist in internal medicine and the specialist surgeon will risk despite *Guilmet* their reputations, their property, literally their all upon the sheer need for hopeful assuagement of the patient's misgivings and fears; only to see things go wrong at the hospital through no fault of theirs.

Those cases will be settled, ere they reach us. Not many will defend in court as Dr. Campbell and Dr. Arena have done, only to find themselves at the mercy of a "contract to cure" when they have undertaken to resect in serious part one of the patient's vital organs. I have no doubt, having read the details of Dr. Campbell's enviably proud record in abdominal surgery and of the assiduous skill employed by him and Dr. Arena in bringing Mr. Guilmet finally to that state of health which is reasonably expectable after such an operation, that the ordeal of this trial and of its ensuing appellate history had much to do with his untimely death last year. He and his partner saved Mr. Guilmet's life. He has lost his, after having been acquitted of negligence and yet held in damages for breach of an unbelievable contract.

All of the defensive measures this *Guilmet* case will breed are not of course foreseeable by one of our profession. Some are, though. Will not the Port Huron or Detroit medic, knowing as he does that equally skilled fellows in medicine are available within 15 minutes across the river, more likely refer that uncertain patient over the international boundary for treatment and surgery; over there where the "law" is a little different? What about Niles to South Bend, or Monroe to Toledo? Withal,

words fit for a judicial report are not available with which to characterize properly the reprehensible nature of this war without warning upon a status of mutual trust.

Such is the ominous and wholly uncalled for stuff of which *Guilmet* is made. I consider myself privileged to be here at this time for rude exposure—in our books—of what before both the legal and medical professions will stand forth as incredible judicial folly; folly because we are *not* forced to make such an unreal decision, as occasionally is due when we interpret and apply a statutory or constitutional provision. Here we deal with the common law. Here wisdom is due *from us;* not legislators or electors. That Lady must have departed our midst January 7 last when five gentlemen of the Court announced that they would endorse what by these presents I oppose.

A final word: Have not all thus far directly concerned with this case, counsel, trial judge, three Judges of the Court of Appeals, and now five Justices of this Court and their clerks, given no thought to where lies the really damning error of judgment for these plaintiffs? Is it not likely, had Mr. Guilmet decided against the recommended operation after having been physically and mentally readied for it by the defendants in February of 1964, that he would *not* be alive today? I apprehend that there is some little life-or-death difference between having a major operation when prepared for it with medical care, and undergoing it in desperate emergency after having been brought in by a speeding ambulance with a third attack of internal bleeding.

My vote is cast as before.

⋅ ⋅ ⋅ ⋅ ⋅ ⋅ ⋅ ⋅ ⋅

*ADDENDA* (June 21, 1971):

The foregoing dissent was delivered to the Brethren March 24, 1971. May 3 our majority withdrew the opinion criticized by that dissent and substituted in its place another which, as I understand, the regular plurality stands ready to endorse.

This latest opinion begs literally if unintentionally for more denunciation of its ominous threat, and for further alert to the retroactive extension it is due to make of limitational time within which the disgruntled may think up suits, for *breach of contract,* against members of the medical profession. It should and will be dissected by means of successively contextual quotations, each followed by timid comment.

1. For the first time since this case came to original submission May 5, 1970, the Brethren standing for affirmance have deigned recognition of the fact that their endorsements lockstep over perilously untested legal ground. Let their opinion speak here, for firm inclusion in our annals, lest the following also disappear by amendment or substitution. By the fourth paragraph of this latest opinion five Justices say (ante at p 61):

"The danger attendant upon decision here is that on one hand if we sanction the award of damages to the plaintiffs we may foster suits which threaten the freedom physicians and surgeons must have in the practice of their vital profession, and on the other hand if we deprive these plaintiffs of their award, we not only may do them an injustice but impair the very process by which we seek to administer justice."[11]

*Comment:* They go on, nonetheless, to court if not invite the conceded danger by upholding, as due

---

[11] Until now, the writer has assumed that "justice" is to be administered "under law."

*contractually,* this "award" against two blameless surgeons in the sum of $50,000. Thus the statewide impact of the Court's decision, upon unknown numbers of present and prospective patients and their necessary relationship with the medical profession (saying nothing of the medics themselves), is weighed with, but found wanting against, the claimed right of these plaintiffs whose good fortune it was that the defendant surgeons by their skill succeeded in saving Mr. Guilmet's life. All this, however, is but nothing compared with the Court's sweeping assignment to fact finders of *all* cases that are pleaded and allegedly supported as at bar. See division "4," *post.*

2. On the same page the Court advises, in a one-sentence paragraph:

"Defendant Dr. Campbell testified that prior to the operation the plaintiff was in excellent physical condition and the operation was *not* an emergency." (Italics by my Brothers.)

*Comment:* This is the occasionally deceptive half of the truth. The rest is that, when Dr. Campbell was sent for in December of 1963, Mr. Guilmet was in or near *extremis,* suffering from ulcerous internal bleeding which had sent him unconscious to the hospital. There and then at home he had to be nursed slowly to that state of health which would permit the operation recommended by Dr. Campbell. This was done under Dr. Campbell's direction, but not until the doctor was satisfied with Mr. Guilmet's condition vis-a-vis the recommended operation.

It is hardly fair, then, for one to aver upon this record that "the operation was *not* an emergency." To the contrary it turned out to be just that, when the defendant surgeons opened Mr. Guilmet's abdomen and found as they did a stomach so diseased that 80% thereof had to be removed.

True, the operation was not deemed an emergency when it was planned by the patient and his major surgeons. Yet I doubt that anyone here is willing to state from the trial court record—upon *our* record—that it was *not* a critical job, a true emergency that is, when as only may be done with utmost precision the extent of internal disease is brought to surgical vision and palpation. Who indeed is willing to suggest, the two-times critical background of Mr. Guilmet's stomach trouble considered, that he in all probability would be just as alive today had the operation *not* been readied and done when it was?

3. Next comes new reasoning by the Court for sustenance of the award of damages now in scrutiny. Having stated plaintiffs' claim

(a) That the observations and descriptions of the result which the defendants made were promises to achieve a specific end, and

(b) That they were inducements upon which the plaintiff Richard Guilmet relied in proceeding with the operation, and

(c) That plaintiffs have characterized all this as an undertaking to "cure" Mr. Guilmet of the stomach disorder from which he was then suffering;

our majority proceeds to "cure" this erroneous theory of recovery by *sua sponte* amendment thereof (an amendment not made, pretentiously or otherwise, upon authority of GCR 1963, 118.3). Read this (quoted from the majority opinion, *ante* at p 67):

"This appellation of 'cure' may be unfortunate.

"The parties when contracting never use the word 'cure' and the mere elimination of a troublesome condition may not always be properly so designated. For example, a headache may be eliminated by decapitation but no one seriously suggests that it is a 'cure'. Similarly the substitution of a different

stomach disorder for a specific one is not properly called a 'cure' of the original ailment."

Then comes what I would suggest is a "gisted" review by the Court, rather than a testimonially quoted presentation, of the facts upon which the Court comes to its judgment and the precedential effect thereof (*ante* at pp 67, 68):

"The following is the gist of what the defendants told him:

" 'Once you have an operation it takes care of all your troubles. You can eat as you want to, you can drink as you want to, you can go as you please. Dr. Arena and I are specialists, there is nothing to it at all—it's a very simple operation. You'll be out of work three to four weeks at the most. There is no danger at all in this operation. After the operation you can throw away your pill box. In twenty years if you figure out what you spent for Maalox pills and doctor calls, you could buy an awful lot. Weigh it against an operation.' "

*Comment:* Compare this "gist" and its preceding quoted counterpart with that which has been deleted from the Court's opinion submitted May 3 last:

"The jury's verdict of 'no negligence' does not resolve the contract question.

"IF THERE WAS A CONTRACT TO EFFECT A CERTAIN RESULT IT DOES NOT MATTER WHETHER THE TREATMENT WAS DONE NEGLIGENTLY OR WITH CONSUMMATE SKILL. IF THE CURE WAS NOT EFFECTED THE CONTRACT WAS BREACHED."[12]

The comparison made, can there be any doubt that a wary Court has decided recently to avoid any precise definition of what it has in mind, as and for

---

[12] For quotation of and respects paid this pair of paragraphs, see *ante* at p 80.

some new theory of recovery by plaintiffs? All the profession gets now is "This appellation of 'cure' may be unfortunate."; plus an intimation that defendants may have breached the alleged contract by substituting "a different stomach disorder for a specific one." As against that plaintiffs' pleaded and tried, and briefed and supported on appeal, theory of count one recovery is that defendants contracted "to cure him [plaintiff Richard Guilmet] of the stomach disorder from which he was then suffering."[13]

Come now Brothers, isn't a planned major operation consisting of a "sub-total gastric resection" of one's stomach, 80% in this instance, reasonably expected to result in a somewhat different stomach disorder than the infinitely more dangerous "specific" these medics diagnosed, as a basis for their recommendation? What then is the "specific" nature of the contract, and of its breach, upon which the Brethren in majority presently rely? Can we have no answer except that—possibly—the plaintiffs did not intend to plead, or try, an issue of contract of "cure" and breach thereof?

4. Next comes that which, presumably, is designed to soothe a profession already beset by steadily mounting malpractice claims. Plainly it will have an opposite effect.

---

[13] The quotation is taken from count one of plaintiffs' complaint. It was never amended. The issue of recovery on that basis, plus the effort of plaintiffs to sustain their count for negligent malpractice, were the only issues that were tried below.

Our only question now is whether the plaintiff burden-bearers made out a *prima facie* case of right to recover under contractually ordered count one. A *prima facie* case is defined (*Purity Ice Cream & Dairy Co.* v. *Adams Express Co.* [1922], 217 Mich 593, 596):

" 'A case made out by proper and sufficient testimony; one which is established by sufficient evidence, and can be overthrown only by rebutting evidence adduced on the other side.' 31 Cyc. p 1172." (Quoted with supporting authority in *People* v. *Licavoli* [1933], 264 Mich 643, 653).

Consider Judge Van Valkenburg's recent article, "Can Our Courts Be Saved?" (February 1971 issue of MSBJ, 75–77, referring to that part headed "Malpractice Cases.") He tells us that which is probably better known to trial lawyers and trial judges throughout Michigan than to appellate Judges:

"Malpractice suits have increased by leaps and bounds in recent years, by about eight to ten percent per year. As every judge knows, they are difficult to try and have a sweeping effect on the medical profession and the public. Doctors become extremely cautious, hospitalize patients for minor matters, order unnecessary tests and X-rays and refuse to handle some cases at all. Further, insurance rates have increased—in one state to $5,000 per year—and inexperienced doctors cannot obtain coverage at all unless connected with a firm."

The Court starts out with observation that "We recognize that what we hold is sometimes made clearer by stating what we do not hold." (*Ante* at p 69.) Then, pursuing such an apparently negative vein, my Brothers proceed to peal out a real alarm rather than an intended "all quiet"; one that is bound to send medics and surgeons posthaste to their lawyers for defensive preparations. To make it doubly clear that this is no overstatement, I repeat from the majority opinion the real "gist" of that which the medical profession is due to face; *nunc pro tunc* six years backward at that (*ante* at p 69).

"What we are saying is that under some circumstances the trier of fact might conclude that a doctor so speaking did contract to 'cure' his patient.

"What was said, and the circumstances under which it was said *always* determines whether there was a contract at all and if so what it was. These

matters are *always* for the determination of the fact finder." (Italics by present writer.)

Cited in support of this last is *Strong* v. *Saunders* (1867), 15 Mich 339. That case is all that is proffered to sustain the quoted and rather remarkable conclusion of law. Now *Strong* was a suit in assumpsit to recover compensation for the use of certain range lights and stakes provided by the plaintiff for the guidance of the defendant's steam tug through the St. Clair Flats, during the navigational season of 1864. The defendant tugboat owner denied obligation to pay on ground that no obligation accrued unless and until the captain of the tug had fixed and certified the amount to be paid, which last had not been done. The Court disposed of the defendant's requests for separate and alternative jury instructions by saying that "There was evidence strongly tending to show an express promise to pay such sum as the defendant's captain should certify to be fair and reasonable; and there also was evidence tending to show an implied promise, or, in other words, a clear duty on the part of the defendant to pay a reasonable compensation; * * * ."

I have read the *Strong* case from one end to the other and am unable to find that the Court employed the inclusive word "always," or that it made any commitment such as I oppose, or any commitment remotely like it. Moreover, the case presented no question whatever of right to an instructed verdict of nonliability. It actually went back for retrial on account of an error of jury instruction not pertinent here.

We have a seven-tined forkful of uncommon law here. The point made now, for cases pleaded and tried as at bar, is that the issue of contractual liability or nonliability of the defendant doctor or surgeon is *always* to be one for determination of the

jury or, if the issue is tried to the court, *always* for the fact finding determination of the judge. The message will get across. The medical profession and its legal advisers will simply have to ask pardon for taking more defensive measures, as all listen respectfully to the word of the Court.

Now for a few concluding observations:

Throughout a year (plus) of disagreement experienced since this case was initially submitted, one continually nagging question persists. It arises out of the jury's reported and accepted verdict of "no negligence," and of "not guilty" (of malpractice). Now most practitioners of law know no way whereby a man may breach a contract another avers he has made excepting (a) by neglect of performance, or (b) by omission or refusal of performance. The latter is not of course charged by these plaintiffs. They do however count upon the former, that is, negligent performance. If any doubt remains on that score, read again the total charging part of count one of plaintiffs' complaint (*ante* at p 71).

Plaintiffs' charge of negligent ("unworkman-like, unprofessional and unskilled") performance was tried as their count-one issue of contractual liability, along with their count two liability issue of negligent malpractice. The jury found no malpractice and "no negligence." How then, all dixitism aside, can the trial court's judgment stand?

If the doctor cannot win even when the jury says "no negligence," how can he win at all without planning and erecting beforehand his own bar of exposure to what this day is made a newly conceived method of penalizing doctors of medicine and major surgeons for untoward results of the best of treatment, the best of surgery?

The patient who, with fear of his contemplated major operation left not too well assuaged by his

consulted but legally forewarned surgeon, cannot be the heartened and trusting patient he should be. The surgeon who must be on legal guard against his patient and the relatives of that patient, simply cannot perform as otherwise he might. Too often he is likely to leave to the patient, by mechanical record, that critical decision of operation or no operation. And when the doctor of medicine or the specialist in surgery learns that he must by law protect himself against suits upon alleged *contracts of cure or result,* suits that are due now to be made expansible timewise from two years to six years, our majority can hardly blame that doctor or surgeon for taking the precautionary advice of his lawyer, rather than what may be intended to be the mollifying word of the Court.

It appears now that the die is cast. We are about to provide for grim ingest by our two most eminent professions the very essence of Michigan's new order of legalistic ultraism. This State, once proud of a national reputation for dependable as well as masterfully written precedents, deserves better than this from a Court which, in the venerable Capitol from which we departed last year, was graced by judges like Cooley in his time and Fellows in the present century.

As before my vote is cast to reverse and remand for entry of judgment in favor of the defendants.