STEWART v. RUDNER.

PHYSICIANS AND SURGEONS—BREACH OF CONTRACT—CAESAREAN SECTION.

> Verdict and judgment of $5,000 for plaintiff woman against defendant osteopath for breach of contract to perform timely Caesarean section is affirmed.

REFERENCES FOR POINTS IN HEADNOTES

41 Am Jur, Physicians and Surgeons §§ 71, 108, 120, 133.

Appeal from Genesee; Elliott (Philip), J. Submitted January 10, 1957. (Docket No. 39, Calendar No. 47,051.) Decided September 4, 1957.

Action by Celie Lois Stewart against Dr. Murray A. Rudner and Dr. Paul C. Bunyan in contract and tort for damages upon stillbirth of child. Case against defendant Rudner dismissed. Case against defendant Bunyan submitted on breach of contract to have timely Caesarean operation performed. Verdict and judgment for plaintiff. Defendant Bunyan appeals. Affirmed.

*Donald R. Freeman,* for plaintiff.

*Snider, Feikens, Dice & Thompson* and *Burroughs & Milliken* (*Robert E. Dice,* of counsel), for defendant.

SMITH, J. Mrs. Stewart, plaintiff herein, had conceived. Though she was a relatively young woman, at least in comparison with her husband, who was 63 (she was only 37), she was disturbed and apprehensive that she might not be able to have the child. She had had 2 previous stillbirths and she was convinced that she could not normally deliver. As she put it, "I know I couldn't go through normal." Yet more than anything else, she testified, she "wanted a sound, healthy baby."

A solution, however, suggested itself to the couple. They would have the baby delivered by a Caesarean section,* thus avoiding what they conceived to be the

---

* "A Caesarean section means the abdominal opening with a scalpel cutting through the skin, superficial fat, going to the fascia and beneath to expose the uterus and then making an incision in the uterus so the baby can be delivered. This incision runs from the navel approximately [to] the pubes and in a natural female is about between 5 and 6 inches. The incision is longitudinal." The term comes from the legend that the mother of Julius Caesar was so delivered. The operation is one of great antiquity.

hazards of a normal delivery. (We will, in this resumé of the facts, construe the controverted testimony most favorably to plaintiff under the assignments of error here made. *Dempsey* v. *Miles,* 342 Mich 185.) Consequently, when she and her husband consulted the defendant, Dr. Paul Bunyan, licensed in Michigan as an osteopathic physician and surgeon, they told him that they "thought that a Caesarean operation would be absolutely necessary." (As a matter of fact the record contains language much more suitable to the urgency and the apprehension felt. "We demanded," testified Mr. Stewart, "that Dr. Bunyan perform a Caesarean operation.") The doctor replied that he was not qualified to perform it but that "Dr. Kesten was the operating physician in the hospital," and, he said, according to Mr. Stewart, "he would see to it that Dr. Kesten was available and that a Caesarean would be performed." Mrs. Stewart, plaintiff, is equally clear. "We told him," she said, "we wanted it taken; he said I would labor for a while and that the other doctor would take— Dr. Kesten would take." There can be no doubt that such a contract was made. The subject of Caesarean section was discussed not once, but "each and every time" that Mr. and Mrs. Stewart consulted with the defendant. Dr. Bunyan himself testified, "I knew Mrs. Stewart wanted a Caesarean. I knew also of the possible problems in the delivery of this child."

During the period of gestation Mrs. Stewart saw Dr. Bunyan regularly. In June of 1953, he told her to have X-rays taken. The X-ray specialist, Dr. Brammick, reported as follows:

"Exhibit D. (Bearing the signature of Paul C. Brammick.)

"June 27, 1953—'Obstetrical consultation is suggested to evaluate this patient because of the age.'"

Dr. Brammick also reported, at this time, "that the baby was 8 months in development." It was only in the preceding month, however, on May 8, 1953, that the defendant had finally concluded that Mrs. Stewart was in fact pregnant. Although his office records listed October 13, 1952 (some 7 months prior thereto), as the first day of her last menstrual period, Dr. Bunyan explained that he was not sure she was pregnant ("I don't stick my neck out until I know for sure") since she might merely have been going through her menopause "and this fools many doctors." There was an additional X-ray examination on August 11th. At this time Dr. Brammick reported that "it was not exactly at term, but it was approaching term, which would bring it in at a 2 or 3-week period." (By "term" the doctor meant "the time in the carrying of the baby when the baby has reached its full growth and it would be about ready to deliver.") He also reported that "the mother had average measurements on her pelvis and that the head was a borderline case at the mid-plane." He again advised obstetrical consultation (Exhibit E: "O.B. Consultation is recommended"), but again no such consultation was had.

We come now to the date of September 4th. It was the belief of Mr. and Mrs. Stewart, that, at this time, she was long overdue. As a matter of fact, it was their belief that the baby had come to full term in July, and they so informed defendant. "We visited Dr. Bunyan in July of 1953 and we gave him the lapsed period of time and told him that we were very much concerned because the time was at hand, practically so." He told them not to worry, "that everything was normal and in good condition." They were back in August, "my wife had not yet delivered." Again the Caesarean was discussed, but the operation was not performed.

On the morning of September 4th Mrs. Stewart's
pains commenced. (She entered the hospital late
that night, complaining of labor pains which had be-
come more severe.) She and her husband again re-
turned to Dr. Bunyan. They told him of the onset of
her pains and expressed concern over her failure to
deliver. They asked Dr. Bunyan why delivery was
not made "at the regular period." He told them not
to worry and "to go home." At this time, testified
Dr. Bunyan, "the baby was alive." The fetal heart
tones were audible, were normal, and sounded "quite
strong." They were, however, the last heard. Ex-
hibit H tells the story: "White female admitted to
the hospital 9–5–53 at 2:30 a.m. Fetal heart tones
not heard." Dr. Bunyan testified that, "As far as I
know," the interne did not call him at that time, or,
in fact, at any time prior to his arrival at the hospi-
tal at 9 that morning. He then, as he says, "looked
at the chart on Mrs. Stewart" and told Dr. Rudner
(the head of the obstetrical department at the hos-
pital) "You take care of this case. It is a rather un-
usual case in that she needs a specialist on the case."
He did not, however, according to his own testimony,
talk with Dr. Kesten about a Caesarean, nor, indeed,
did he even apprise Dr. Rudner "that there had been
any discussion between myself and the Stewarts
regarding a Caesarean operation. I did not con-
sider it important to tell him that. I probably told
him about the background of the case, but I can't
guarantee that I did." Dr. Rudner is equally vague.
"I do not remember," he testified, "whether Dr. Bun-
yan gave me a run-down on this case when we first
conferred." The hospital records, however, seem
explicit as to whether or not there could be a success-
ful normal delivery:

"Exhibit A. (Containing the signature of Paul C.
Bunyan.)

"*Q.* Do you expect a normal delivery in this case?
"*A.* No. Doubtful at least.
"*Q.* If not, why?
"*A.* Two previous stillborn babies, plus her age as a big factor."

"Exhibit B. (Dated September 5, 1953.)
"*Q.* Previous obstetric history, abortions, months of pregnancy, cause.
"*A.* One stillbirth at 9th month, one miscarriage at 6 months.
"(In Dr. Bunyan's handwriting):
"Uterine pregnancy full term, outlook for labor fair to bad. Stillborn babe delivered."

In the early afternoon of that same date, around 1 p.m., Dr. Rudner examined the plaintiff for the first time. "At that time," he testified, "I could pick up no fetal heart tones and I considered that I had a dead fetus." He left instruction for her care and about 10 o'clock that night he delivered her, after performing what is described as an episiotomy, a surgical cut or incision to facilitate delivery and prevent tearing. The child was dead.

Suit was brought by plaintiff against Dr. Bunyan and Dr. Rudner. The declaration contained 2 counts. The first, against Dr. Bunyan alone, was for breach of contract, it describing, as well, the allegedly unauthorized operation (episiotomy) performed by the other defendant, Dr. Rudner. The second, against both doctors, sounded in tort for assault and battery. At the close of plaintiff's opening statement, motion to dismiss for misjoinder of parties defendant was denied. At the end of all proofs the court, upon motion, dismissed the second count "and that part of the first count that has to do with the operation performed by Dr. Rudner." The case went to the jury "on the question of whether or not plaintiff has shown by a preponderance of the evidence in spite of the experts' testimony that a Caesarean was

agreed to and if agreed to should have been performed and whether or not the damages which the plaintiff received was a result of the failure to so do."

The jury returned a verdict of $5,000 for the plaintiff against Dr. Bunyan, and he comes to us on a general appeal. He argues, primarily, that there is a fatal defect as to damages. "The record is barren," he says, "as to any showing that (my) failure to have a Caesarean performed on this plaintiff in any way caused the loss of the baby." Moreover, he says, the court was in error in denying his request that the jury be charged that they were "not permitted to award damage to the plaintiff for whatever grief or injury she sustained because her baby was not born alive." This is amplified in the brief. "Damages, if any," it is there said, "are restricted to those damages which were the direct result of the breach, and such as may be fairly supposed to have been in the contemplation of the parties when the contract was made." So, we agree, they are.

We will first consider appellants' assignments of error involving the award of damages, in an action *ex contractu,* for mental anguish, grief and sorrow. Specifically, it is claimed that the court erred in refusing the following charge to the jury:

"I charge you that damages, if any, cannot be awarded for sorrow and grieving caused by the loss of plaintiff's child in that such grieving and injured feelings are too remote to be considered an element of damages."

There is ample support in the cases and in the texts for the proposition stated. Few areas of our law, however, are more shrouded in mists of history and of doubt than this area of recovery for mental distress, for grief, anxiety, or sorrow. Dean Pound reminds us (An Introduction to the Philosophy of

Law, p 241) that "Law did not concern itself at first with agreements or breaches of agreements. Its function was to keep the peace by regulating or preventing private war and this only required it to deal with personal violence and with disputes over possession of property." Of course, if the mental distress were sufficiently close to physical violence, even though no actual bodily impact was made, recovery might be had. Thus the early case (1348)* wherein one W, finding a tavern closed one night, struck on the door with a hatchet until the proprietor's wife "put her head out at a window and ordered him to stop; and he perceived her and struck with the hatchet, but did not touch the woman." It was held that he must respond in damages in spite of his failure to bruise or wound other than her sensibilities. Here, of course, we are close to the private war described by Dean Pound. Generally, however, the common law has been "reluctant to recognize the interest in one's peace of mind as deserving of general and independent legal protection, even as against intentional invasions." (Magruder, Mental and Emotional Disturbance in the Law of Torts, 49 Harv L Rev 1033, 1035.) The reluctance manifested in the field of torts was roughly paralleled in the contractual area and for the same reasons. Thus we find in *Francis* v. *Western Union Telegraph Co.,* 58 Minn 252, 261, 262 (59 NW 1078, 49 Am St Rep 507, 25 LRA 406), the court holding as follows:

"We are therefore left to determine the question here presented according to the rules of the common law applicable to actions for damages for breach of contract. In such actions can damages be recovered

---

* *I DeS et ux* v. *W DeS,* Y B Liber Assisarum, f 99, pl 60 (1348). We are indebted to the Ames and Smith translation in their Selection of Cases on the Law of Torts (1919, Pound ed), p 1.

for mental suffering resulting from a breach of the contract?

"The law has always been exceedingly cautious in allowing damages for mental suffering, for the manifest reasons, among others, that such damages are more sentimental than substantial, depending largely upon temperament and physical and nervous condition. The suffering of one under precisely the same circumstances would be no test of the suffering of another, and there being no possible standard by which such an injury can be even approximately measured, they are subject to many, if not most, of the objections to speculative damages which are universally excluded."

These and similar objections to recovery for mental disturbance, applicable equally to tort and contract actions, have been so thoroughly demolished in recent years that we will not take the time for review. See Prosser, Law of Torts (2d ed), § 37.; 1 Harper and James, Law of Torts, ch 9, and cases and articles there cited. Although the law in this field is in a state of marked transition and fluidity, it is not too early to state that there is a marked trend towards recovery. There was a day, as we noted above, when the prevention of "private warfare" fulfilled the highest function of the court, when a visibly cracked skull was a *sine qua non* for recovery, but the precedents of that era no longer control. We have come to realize, slowly it is true, that the law protects interests of personality, as well as the physical integrity of the person, and that emotional damage is just as real (and as compensable) as physical damage. See Goodrich, Emotional Disturbance as Legal Damage, 20 Mich L Rev 497.

We have now to consider the contract made. A doctor and his patient, of course, have the same general liberty to contract with respect to their relationship as other parties entering into consensual rela-

tionship with one another, and a breach thereof will give rise to a cause of action. It is proper to note, with respect to the contracts of physicians, that certain qualitative differences should be observed, since the doctor's therapeutic reassurance that his patient will be all right, not to worry, must not be converted into a binding promise by the disappointed or quarrelsome. Those qualifications we have in mind as we proceed.

It should be noted, also, early in our discussion, as the appellate division of the New York courts observed in *Colvin* v. *Smith,* 276 App Div 9 (92 NYS2d 794), that "this cause of action (in contract) is entirely separate from malpractice, even though they both, as here, may arise out of the same transaction." The court continues:

"The 2 causes of action are dissimilar as to theory, proof and damages recoverable. Malpractice is predicated upon the failure to exercise requisite medical skill and is tortious in nature. The action in contract is based upon a failure to perform a special agreement. Negligence, the basis of the one, is foreign to the other. The damages recoverable in malpractice are for personal injuries, including the pain and suffering which naturally flow from the tortious act. In the contract action they are restricted to the payments made and to the expenditures for nurses and medicines or other damages that flow from the breach thereof."

What, then, are the "other damages" that flow from the breach thereof? Is it true, as defendant asserts, that in an action for breach of contract no damages for mental anguish may be awarded?

The general rule as to damages is stated in 15 Am Jur, Damages, § 51, p 449, in the following terms:

"A party to a contract who is injured by another's breach of the contract is entitled to recover from the

latter damages for all injuries and only such injuries as are the direct, natural, and proximate result of the breach."

It is true, in the ordinary commercial contract, damages are not recoverable for disappointment, even amounting to alleged anguish, because of breach. Such damages are, in the words of defendant's requested charge, "too remote." But these are contracts entered into for the accomplishment of a commercial purpose. Pecuniary interests are paramount. In such cases breach of contract may cause worry and anxiety varying in degree and kind from contract to contract, depending upon the urgencies thereof, the state of mind of the contracting parties, and other elements, but it has long been settled that recovery therefor was not contemplated by the parties as the "natural and probable" result of the breach. *Hadley* v. *Baxendale,* 9 Exch 341 (156 Eng Rep 145, 5 Eng Rul Cas 502) ; *Clark* v. *Moore,* 3 Mich 55 ; *Miholevich* v. *Mid-West Mutual Auto Insurance Co.,* 261 Mich 495 (86 ALR 633) ; *Frederick* v. *Hillebrand,* 199 Mich 333.

Yet not all contracts are purely commercial in their nature. Some involve rights we cherish, dignities we respect, emotions recognized by all as both sacred and personal. In such cases the award of damages for mental distress and suffering is a commonplace, even in actions *ex contractu.* One of Justice Cooley's cases is often cited for the principle. *Vanderpool* v. *Richardson,* 52 Mich 336, involved breach of a promise to marry and it was clearly held that damages were recoverable for (p 339) "the injury to the plaintiff's feelings and reputation, and any circumstances of indignity under which the wrong was done, and the consequent public disgrace to the plaintiff." See, also, *Humphrey* v. *Michigan United Railways Co.,* 166 Mich 645, where-

in the contract of passage was violated by the agent's employment to a passenger of insulting and abusive language; *Frewen* v. *Page,* 238 Mass 499 (131 NE 475, 17 ALR 134) (breach of contract for hotel lodgings); *Fitzsimmons* v. *Olinger Mortuary Association,* 91 Colo 544 (17 P2d.535) (breach of contract for burial). The principle involved in all of these cases (and in the case at bar) is well stated in the following quotation from 1 Sutherland on Damages (1882 ed), pp 156–158:

"May damages for breach of contract include other than pecuniary elements?—In actions upon contract, the losses sustained do not, by reason of the nature of the transactions which they involve, embrace, ordinarily, any other than pecuniary elements. There is, however no reason why other natural and direct injuries might not justify and require compensation. Contracts are not often made for a purpose, the defeating or impairing of which can, in a legal sense, inflict a direct and natural injury to the feelings of the injured party. A breach of promise of marriage is an instance of such a contract, and such considerations enter into the estimate of the damages. The action for such a cause is often referred to as an exceptional action. In a certain sense it is so; but in the particular under consideration, it is only peculiar. It is an action upon contract, and the damages allowed are such as, considering the nature and benefits of the thing promised, will be an adequate compensation. They being of a personal nature, cannot be wholly measured by a pecuniary standard; the cause of action, for the same reason, does not survive; it dies with the person, as all demands for personal injuries do. They are recoverable by the injured party because they proceed directly and naturally from the breach. Other actions upon contract may embrace like damages. * * * While it is true that if the breach causes no actual injury beyond vexation and annoyance, as all breaches of contract do more or less, they are not subjects

of compensation, unless to the extent that the contract was made specially to procure exemption from them. To that extent, that is, where a contract is made to secure relief from a particular inconvenience or annoyance, or to confer a particular enjoyment, the breach, so far as it disappoints in respect of that purpose, may give a right to damages appropriate to the objects of the contract."

See, also, section 92 of the 1916 (4th) edition of the Sutherland treatise and cases there cited.

The cases to which reference was just made involve a clear exception to the "rule" (if there now is any such) that damages for mental suffering are not recoverable in contract actions. They are. When we have a contract concerned not with trade and commerce but with life and death, not with profit but with elements of personality, not with pecuniary aggrandizement but with matters of mental concern and solicitude, then a breach of duty with respect to such contracts will inevitably and necessarily result in mental anguish, pain and suffering. In such cases the parties may reasonably be said to have contracted with reference to the payment of damages therefor in event of breach. Far from being outside the contemplation of the parties they are an integral and inseparable part of it.

Thus in *Lamm* v. *Shingleton*, 231 NC 10 (55 SE2d 810), an action for breach of contract for failure to furnish a watertight casket and to lock the same, the court held, in part, as follows (pp 14, 15):

"Where the contract is personal in nature and the contractual duty or obligation is so coupled with matters of mental concern or solicitude, or with the sensibilities of the party to whom the duty is owed, that a breach of that duty will necessarily or reasonably result in mental anguish or suffering, and it should be known to the parties from the nature of the contract that such suffering will result from its

breach, compensatory damages therefor may be re-
covered. 15 Am Jur, Damages, § 182, p 600; Mc-
Cormick on Damages, p 592; *Warner* v. *Allen* [*sub
nom., Warner* v. *Benham,* 126 Wash 393 (218 P 260,
34 ALR 1358) ]. In such case the party sought to
be charged is presumed to have contracted with ref-
erence to the payment of damages of that character
in the event such damages should accrue on account
of his breach of the contract. · *Renihan* v. *Wright,*
125 Ind 536 (25 NE 822, 9 LRA 514); McCormick on
Damages, p 595."

Similarly, in the case before us, can any reason-
able person doubt that mental pain and suffering
were within the contemplation of the parties before
us in event plaintiff were damaged by breach? Is
any other contemplation, in fact, within the scope of
the facts established upon trial? Here we have a
couple, no longer young, who are convinced (and
who can say without reason?) that their only chance
for life is through the Caesarean section. The de-
manded operation was not a trivial and subordinate
aspect of their agreement. It was of the essence
thereof, the sole reason for its being, the indispen-
sable ingredient. There was not an iota of the com-
mercial in their contract. Tragedy, they felt, would
again visit them, were they not to have the safe-
guard of skillful surgery rather than the uncon-
trolled processes of nature that had proven doubly
disastrous in the past. We now know that the hour
of delivery having come, and gone, without the inter-
vention of the surgeon's skill, again the plaintiff felt
the exquisite cruelty of hope destroyed and life de-
nied. It is not disputed that the suffering existed.
As her doctor, defendant Dr. Bunyan testified, "I
went back to see her on September 8, 1953, but she
would not talk to me. She lay there and cried. It
seemed to hit her pretty hard." If we are to avoid
the jury's verdict we will have to conclude that the

suffering described in the record before us was not within the reasonable contemplation of the parties when the contract for delivery of the child by Caesarean was made. This we cannot do and the mere suggestion thereof seems somehow repellent.

But the primary contention, and the alleged deficiency in proof about which the most serious claims of error revolve, is that the court should have directed a verdict at the close of plaintiff's case, that there was no competent evidence that plaintiff suffered any damage as a result of Dr. Bunyan's breach of contract. Or, as elsewhere put, "the record is barren as to any showing that Dr. Bunyan's failure to have a Caesarean performed on this plaintiff in any way caused the loss of the baby."

The defendant misconceives the legal issue.. At this juncture of the case (the close of plaintiff's proofs) and on defendant's motion to dismiss, the testimony offered is to be construed as strongly as possible in plaintiff's favor. *Dempsey* v. *Miles,* 342 Mich 185. Viewed in this light, what have we here? First of all, the jury was justified in finding that the baby was alive, with a strong fetal heart beat, on the morning of September 4th, when plaintiff and her husband came to defendant's office, expressing concern that delivery "was not made at the regular period." The jury also knew that the mother's full term had run, that the long wait was over and the hour of delivery at hand. The jury knew, in addition, that plaintiff's pains had commenced, that they persisted and that within hours, in fact, she was admitted to the hospital and delivered of a dead child. They would be justified in finding, on these facts, that if plaintiff had been sent to surgery, instead of back home, on the morning of September 4th (at the latest) that her baby would have been delivered alive. There is, of course, no absolute certainty thereof. The knife might have slipped, or the child

might have died at any instant because of forces beyond our control, beyond, possibly, even our comprehension. But absolute certainty we do not demand, particularly where there can be no certainty from the very nature of the case. The jury's calculus does not demand certainties but only probabilities. As we observed, the defendant misconceives the legal issue. The burden was not, as he asserts, upon the plaintiff to show that the failure to operate "caused" the loss of the baby. The plaintiff's burden was lesser. It was her burden to show to the jury with reasonable (not mathematical) certainty that if the defendant had caused the operation to be performed in accordance with his agreement, the surgeon would then have delivered, alive, the baby whose strong and normal heart tones were so clearly audible. The cause of the later death is immaterial to the cause of action she is asserting. This is not an action in tort for causing the death of the baby.

Her burden of proof she bore. Upon the showing outlined above, a prima facie case for recovery was made out, sufficient to take the case to the jury. Justice CAMPBELL's felicitous phrase (*Watkins* v. *Wallace,* 19 Mich 57, 76) comes often to mind as we reflect upon the doubts, as opposed to the certainties of proof: "If the testimony produces a rational belief, a civil jury cannot be required to discard it because it is not conclusively established." Or, in the words of Stacy, C. J., in *McDaniel* v. *Atlantic Coast Line Railway,* 190 NC 474, 475 (130 SE 208):

"A 'prima facie' case means, and means no more than evidence, sufficient to justify, but not to compel, an inference of liability, if the jury so find."

Likewise, in *Knudson* v. *Knudson,* 382 Ill 492, 495 (46 NE2d 1011):

"The test of the existence of the right to have the cause submitted to a jury  *  *  *  is whether there is evidence in the record which, with all its reasonable inferences, taken in the aspect most favorable to the contestant, may be said to be sufficient in law to support the cause of action."

There is no merit in the claim of error that the court should have granted defendant's motion for judgment *non obstante veredicto.* Although defendant's expert, Dr. Bruckner, testified at one point on direct examination that it "would have been a deviation from the standards of practice to do a Caesarean section at any time before or at term," he testified on cross-examination that:

"It is possible to perform a Caesarean operation if it appears there is a necessity by previous stillbirths and it is possible to perform that operation before term. There are times when an obstetrician, or physician, or even a surgeon realizes that a problem exists where the child may be taken away from the mother before she goes through labor."

Looking at the testimony in its entirety, we are in accord with the position of the trial court, expressed in these terms:

"I think, in retrospect at least the plaintiff's belief that a Caesarean operation was necessary and desirable is justified by the facts and I believe and the jury evidently believed that if there had been a Caesarean operation—and this baby was alive the day before this woman went to the hospital  *  *  * that the Caesarean operation would in all probability have been a success."

The damages claimed are for pain and mental suffering, and for loss of wages (for a 13-week period following her recovery from the physical results of the episiotomy performed) due to her nervous condition and chills and fever attendant upon and

arising from the circumstances hereinabove related. The jury was justified in finding that these resulted directly from defendant's failure to perform his contractual obligations. As we said in *Denny* v. *Garavaglia,* 333 Mich 317, 326:

"For many years this Court has adhered to the rule that an award for damages in personal injury cases will not be disturbed if reasonably within the range of the testimony."

There was no error in the court's denial of defendant's motion to dismiss for improper joinder of parties defendant, CL 1948, § 608.1 (Stat Ann § 27.591); *Gilmer* v. *Miller,* 319 Mich 136, nor is there merit in the remaining assignments of error.

Affirmed. Costs to appellee.

EDWARDS, VOELKER, and BLACK, JJ., concurred with SMITH, J.

DETHMERS, C. J., and SHARPE, KELLY, and CARR, JJ., concurred in the result.