749 A.2d 157

Lenox DINGLE, M.D.

v.

Deborah M. BELIN.

No. 98, Sept. Term, 1999.

Court of Appeals of Maryland.

April 11, 2000.

Catherine W. Steiner (Whiteford, Taylor & Preston, L.L.P., on brief), Baltimore, for petitioner.

Leslie L. Gladstone, Baltimore, for respondent.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, RAKER, WILNER, CATHELL and THEODORE G. BLOOM (retired, specially assigned), JJ.

WILNER, Judge.

The issue before us was characterized by the Court of Special Appeals in this case as one of "ghost surgery." The more precise question is whether a surgeon who is employed by a patient to perform certain surgery and who agrees, as part of that employment, to do the actual cutting, leaving to assisting residents a subordinate role, may be held liable for breach of contract, distinct from negligence in the performance of the surgery or negligence associated with the failure to obtain informed consent from the patient, if the surgeon attends and participates in the surgery but permits a resident to do that cutting.

The Circuit Court for Baltimore City concluded that the claim for breach of contract made by respondent Deborah Belin was, in effect, subsumed in her alternative claims of negligence and, for that reason, entered judgment as a matter of law on the breach of contract action at the conclusion of the evidence. The Court of Special Appeals reversed that part of the judgment. *Belin v. Dingle,* 127 Md.App. 68, 732 A.2d 301 (1999). Although we do not consider what allegedly occurred here to be "ghost surgery," on the facts of this case we agree that a claim for breach of contract was sufficiently pled and proved to warrant submission of that claim to the jury. We shall reverse the judgment of the Court of Special Appeals dealing with that claim, however, because we conclude that the essential underpinning of the claim was, in fact, submitted to the jury, which determined the issue in the doctor's favor.

## BACKGROUND

On June 29, 1993, Ms. Belin, employed petitioner, Lenox Dingle, a general surgeon with operating privileges at Mercy Hospital in Baltimore, to perform a laparoscopic cholecystectomy—the removal of her gall bladder through a small incision in her abdomen. In brief, the surgery involves making the incision and inserting at least three ports into the abdomen. Carbon dioxide is introduced into the abdomen to expand the area and make it more visible. A camera, inserted through

one of the ports, displays the interior on two high-definition television monitors. Observing the monitor, one physician, through another port, retracts the organs and tissues in order to isolate the gall bladder and the structures that connect it to other organs and tissues, and a second physician, also observing the monitor, cuts and clips those connecting structures and removes the gall bladder through a port.

The surgery occurred at Mercy on July 2. Dr. Dingle was assisted by a medical student and by a resident, Dr. Magnuson, who was just beginning her fourth year of residency training. The student was responsible for operating the camera, which was done properly. Dr. Dingle did the retractions, exposing the field. Dr. Magnuson dissected the gall bladder and removed it. She and Dr. Dingle regarded the surgery as routine, without incident. There was, however, a problem. One of the connecting structures that needed to be dissected was the cystic duct, which runs from the gall bladder to the common bile duct. The common bile duct runs from the liver to the intestines. Instead of dissecting the cystic duct, Dr. Magnuson dissected and clipped the common bile duct, which resulted in the drainage of bile into Ms. Belin's abdomen. That, in turn, led to a great deal of pain and discomfort and to the need for extensive corrective surgery at Johns Hopkins Hospital.

In November, 1996, after having waived arbitration pursuant to Maryland Code, § 3–2A–06(b) of the Courts and Judicial Proceedings Article, respondent filed suit against Dr. Dingle, Dr. Magnuson, and Mercy Hospital in the Circuit Court for Baltimore City. The amended complaint now before us contained four counts—negligence based on the lack of informed consent, battery, negligence in the performance of the surgery, and breach of contract. Aside from the negligence alleged as part of the lack of informed consent, Dr. Dingle was not charged with any separate negligence in delegating duties or responsibilities to Dr. Magnuson. The claim of general negligence focused solely on the actual conduct of the surgery.

The battery count was dismissed by the court at the end of respondent's case and is no longer an issue. The claim for breach of contract by Dr. Dingle was dismissed by the court at the end of the entire case. The correctness of that ruling is the heart of this appeal. The counts for negligence arising from the lack of informed consent and negligence in the performance of the surgery were submitted to the jury, which returned verdicts for the defendants.

The claims for breach of contract and lack of informed consent were both based on the assertion that, when Ms. Belin employed Dr. Dingle, she insisted, and he agreed, that, although he would be assisted in the surgery by one or more residents, he would do the actual cutting and removal of the gall bladder. In Count One—lack of informed consent—she alleged that "[b]ecause Belin was aware that Mercy was a university affiliated hospital and often used for teaching inexperienced residents in various surgical techniques, Belin requested and received assurances from Dingle that he would perform the surgical procedure in the cholecystectomy and only use a resident to assist him as was absolutely necessary." The thrust of Count One was the assertion that, without Belin's knowledge or consent, the resident Magnuson "played a very active role in the surgery" and "did the cutting, clamping and stapling that should have been performed by [Dingle]" and that, by failing to inform Belin of the scope of responsibilities that would be performed by Magnuson, Dingle and Magnuson "breached their duty to secure the fully informed consent of Belin prior to commencing operating upon her." Had she been aware of the active role to be played by Magnuson, Belin asserted, she would not have consented to having the surgery performed at Mercy or by Drs. Dingle and Magnuson. For that breach of duty, Ms. Belin sought compensation for all injuries and losses, past, present, and future, sustained by her, all of which, she claimed, were caused by the defendants' negligence in failing to obtain her informed consent.

Count Four, alleging the breach of contract, incorporated all of the allegations stated in the other counts. It added that

Dingle had entered into an oral contract with Belin under which he had agreed "that he would do the identification of the anatomy and the cutting and clipping required during the [surgery] and not a resident or other assistant," and that, in consideration of that agreement, she agreed to allow Dingle to perform the surgery. Dingle breached that contract, she averred, by permitting Dr. Magnuson to perform the cutting and clipping of the gall bladder and related structures. The same measure of damages was asserted—"compensation for all injuries, damages and losses, past, present and future, which she has sustained, is sustaining and will sustain in the future, all of which were caused by the breach of contract."

It was undisputed that Drs. Dingle and Magnuson both participated in the surgery, that Dr. Dingle did the necessary retractions, and that Dr. Magnuson performed the dissections and removed the gall bladder. It was also undisputed that Ms. Belin had no contact whatever with Dr. Magnuson before the surgery, although she was aware that one or more residents would be assisting Dr. Dingle.

The evidence regarding the alleged contract and what Dr. Dingle said and agreed to do was in sharp dispute. Ms. Belin testified that she told Dingle "that I wanted him to be the one that was going to cut me and identify the gall bladder and take it out," that he advised her that he could not do the surgery by himself, and that she said she understood "but if you have a resident in there, I just want that person to maybe suture me up." She added, "I want you to be the one to do my surgery. And he agreed." Ms. Belin informed the jury that, as a surgical technician who worked at Mercy, she was aware that it was a teaching hospital and that surgeons often allowed residents to play a major role in surgery, and she did not want her surgery to be used for training purposes.

The written consent that Ms. Belin signed authorized Dr. Dingle "and/or such assistants as may be selected and supervised by him" to perform the laparoscopic cholecystectomy. The form has a place for "Special remarks or comments by patient," which was left blank. There was no indication on the

written consent form, in other words, of any allocation between Dr. Dingle and the assistants selected and supervised by him as to what, precisely, each was to do during the surgery. Dr. Dingle denied that he ever had the conversation testified to by Ms. Belin and stated that he never would have agreed to the conditions she alleged. Although at one point he said that, to satisfy those conditions, the surgery would have to have been performed at another hospital, Dr. Dingle indicated that, if faced with that demand, he would have offered Ms. Belin only two options—"allow me to do what I thought was best unrestricted, or to get another surgeon."

The evidence was essentially undisputed that the particular surgery requires three medical participants—one to operate the camera, one to do the necessary retractions, and one to do the dissection and removal. It would thus not have been possible for Dr. Dingle to do *both* the retraction and the dissection and removal, as Ms. Belin said he agreed to do. Dr. Dingle and the defense experts opined that the retraction and exposure of the field was often the more difficult and demanding aspect of this kind of laparoscopic surgery. One of Dr. Dingle's expert witnesses, Dr. Bailey, testified that in most instances the attending surgeon does the retracting and the resident does the dissecting and clipping. The reason, he said, was that the retraction requires a high hand-to-eye skill level, to be able to manipulate and maneuver the gall bladder and keep it properly exposed. Ms. Belin's expert witness, Dr. Goldstone, agreed that it would not breach the standard of care for the resident to do the cutting and clipping and the attending surgeon to do the retracting, "[p]rovided there isn't some previous agreement that this would not occur."

All of the experts agreed that, when one surgeon does the retraction and another does the clipping and cutting, both consult and agree on where the clips are to be put and where the cuts are to be made. They both have the benefit of the television monitors. Dr. Goldstone testified that "not one clip is applied until you both agree where it is to be put" and "not one cut is made with the scissors until you both agree that the cut is being made in the proper place." The evidence indicat-

ed that that procedure was followed in Ms. Belin's case—that Drs. Dingle and Magnuson consulted and agreed on where the cuts were to be made and the clips applied.

At the end of the plaintiff's case, the defendants moved for judgment on all counts. Dingle submitted on the negligence claim but argued that the breach of contract claim was essentially a restatement of the negligence action, for, in order to recover for breach of contract, Belin would have to prove negligence arising out of the contractual relationship. He urged that a lack of informed consent claim does not "go to the mechanism by which the operation is to be conducted" or to "resident involvement" and that there was no battery because the cutting of the common bile duct was not intentional. Ms. Belin responded that the breach of contract action arose from Dr. Dingle's commitment to do the cutting and not from any negligence arising from the contract. Although expressing the belief that the breach of contract action was "duplicitous," the court reserved judgment on that count. It granted the motion only as to the battery claim.

Following the defense case, the motion for judgment was renewed. Dr. Dingle once again argued that, to recover for breach of contract, Ms. Belin would have to prove negligence, for "[s]he does not have any special damages because of the alleged breach of contract." Moreover, he contended that there was no indication of a higher risk for the particular injury that occurred because a resident did the clipping and cutting and no indication that anything that occurred to her that would not have occurred had Dr. Dingle done the clipping and cutting. Ms. Belin's response to that argument and to the motion itself, as it pertained to the breach of contract claim, is unclear from the record. This is another instance in which the proceedings were recorded by audio-visual means, rather than by a court reporter, and there are apparent gaps in the record. The transcript made from the audio tape shows counsel stating that "as long as it's made clear to the jury that this contractual issue is part of the cause—and or the negligence—then fine, I have no problem with you granting the motion for dismissal. . . . So, as long as that can be consid-

ered by the jury as part of negligence by—then, that's fine with me." The court then granted the motion to dismiss the breach of contract claim, stating, according to the transcript, "I think the damages from a breach of contract would be much more liberal—than—and therefore—. So I will grant the motion for judgment." The remaining negligence counts—one based on negligence in the performance of the surgery and the other based on lack of informed consent—were submitted the jury.

In its instructions to the jury, the court essentially merged the two claims of negligence on the part of Dr. Dingle— negligence in the performance of the surgery and negligence in failing to obtain an informed consent. It informed the jury that a health care provider is negligent if the provider "does not use that degree of care and skill which a reasonably competent health care provider engaged in a similar practice and acting in similar circumstances would use" or, "[p]ut another way, a health care provider is negligent if he or she breached or deviated from the applicable standard of care." The court immediately followed that instruction with the statements that "[a] surgeon must obtain consent from the patient to perform a surgery" and "[t]o obtain the required consent, the surgeon must explain the surgery to the patient and warn of all material risks or dangers in the surgery." A material risk, the court continued, "is one which a physician knows or ought to know would be significant to a reasonable person in the patient's position in deciding whether or not to submit to a particular medical treatment or procedure." The surgeon is negligent, it added, "if the surgeon fails to disclose to the patient all the material information, risks, and warnings."

In a prepared verdict sheet, four questions were submitted to the jury. The first asked simply whether Dr. Dingle was "negligent causing Plaintiff, Deborah Belin, injuries." It did not distinguish between negligence in the performance of the surgery and negligence in failing to obtain an informed consent. The second asked the same question as to Mercy Hospital, based on the conduct of Dr. Magnuson. The jury was instructed that, if the answer to those questions was "no,"

it was to stop and return a verdict for the defendants. A third question, to be addressed only if there was an affirmative answer to question (1) or (2), related to damages. The parties agreed that Ms. Belin sustained hospital bills of $50,024 and doctor bills of $30,345 for the corrective measures necessitated by what had occurred and that Dr. Dingle was paid $2,800 for performing the surgery. Ms. Belin was also, of course, seeking substantial damages for pain and suffering.

In accordance with the court's ruling on the breach of contract claim, that claim was not mentioned in any of the closing arguments. The question of whether Dr. Dingle ever agreed to the conditions asserted by Ms. Belin *was* argued, however. Plaintiff's counsel told the jury that, in order to find for the defendants, the jury, among other things, would "have to find that my client, Deborah Belin, is lying regarding her request made to Dr. Dingle." Defense counsel reminded the jury of Dr. Dingle's denial that the conversation testified to by Ms. Belin ever occurred and suggested that, at most, she may have asked whether Dr. Dingle was going to be "her surgeon." Because of its negative answers to the first two questions, finding no negligence on the part of either doctor, the jury, following the court's instructions, did not address the issue of damages.

On appeal to the Court of Special Appeals, Ms. Belin complained, among other things, that the trial court erred in dismissing the breach of contract action on the theory that it was subsumed under the negligence count, and, as noted, the intermediate appellate court, in a split decision, found merit in that complaint. One member of the panel, based on the recorded response by plaintiff's counsel to Dr. Dingle's motion and the fact that counsel was not inhibited from arguing the alleged agreement to the jury in the context of the lack of informed consent claim, concluded that Ms. Belin had effectively consented to the dismissal and thus failed to preserve her complaint for appellate review. The panel majority found otherwise. After listening to the audiotape recording, it concluded that the transcript of the argument on the motion was incomplete and did not record everything said at the bench

conference, and, in the absence of any argument of non-preservation by Dr. Dingle, it accepted counsel's assertion that he did object to the dismissal.

Relying principally on a New Jersey case, *Perna v. Pirozzi*, 92 N.J. 446, 457 A.2d 431 (1983), the appellate court concluded that, if Dr. Dingle agreed to the conditions asserted by Ms. Belin and then failed to observe that agreement, his "contractual obligation was separate from and existed independent of his duty to make sure that no deviation from the applicable standard of care occurred during the operation." *Belin v. Dingle*, 127 Md.App. at 81, 732 A.2d at 307. The court went on to hold that, even if the patient proves a breach of the contract, the doctor is not liable for injuries that the patient would have suffered had there been no breach. In that regard, it declared that, once the jury finds that the contract was breached and the operation was unsuccessful, "the patient has the burden of persuasion on the issue of what damages resulted from the unintended consequences of the operation, i.e. those injuries that would not have followed from a successful operation" and "the physician has the burden of persuasion on the issue of what injuries would have followed the unsuccessful operation even if the physician had not breached the agreement." *Id.* at 82, 732 A.2d at 308.

We granted *certiorari* principally to consider whether a physician who, as part of his or her contractual undertaking with a patient, agrees to an allocation of tasks between the physician and other physicians, may be liable for breach of contract if that agreement is violated.

## DISCUSSION

### Preservation

As noted, the Court of Special Appeals panel was split on whether Ms. Belin effectively consented to the dismissal of her breach of contract claim, with the understanding that she could argue the alleged agreement with Dr. Dingle in the context of her action for lack of informed consent. The panel majority gave plaintiff's counsel the benefit of the doubt, and

so shall we. There *are* apparent gaps in the record as to what was said in response to the defense motion, both by plaintiff's counsel and by the court, and it is significant that Ms. Belin clearly objected to the same motion when made at the end of her case. Even if she failed to articulate a proper objection at the conclusion of the evidence, however, the Court of Special Appeals had discretion to consider the issue, which it chose to do. As we indicated, non-preservation was not raised as an issue by Dr. Dingle in the Court of Special Appeals. Although it was raised by him, for the first time, in his petition for *certiorari*, we did not grant the petition to review an issue of preservation. We granted the petition to consider the substantive issue noted above.

### *Sorting Out Causes of Action*

Ms. Belin urges that there is a proper cause of action for breach of contract when a physician promises to fulfill a particular surgical function but fails to do so, resulting in harm, and that that action is independent of any negligence on anyone's part. Her point is that Dr. Magnuson made a mistake in cutting and clipping the common bile duct which, even if not negligent, might not have been made had the cutting and clipping been done by Dr. Dingle, a more experienced surgeon. Dr. Dingle contends that Maryland should not recognize, under any theory, "a claim for 'ghost surgery' against a physician arising out of an alleged agreement regarding the role a resident is to play during a surgical procedure." At the very least, he contends, such a claim should not be permitted as part of an action for lack of informed consent or breach of contract. Creating a duty to disclose a resident's precise role, he warns, "would permit patients to choreograph how an operation is to be performed negating all possibility of informed medical judgment occurring during the operation."

The courts, in proper cases, have recognized a number of different causes of action that might lie against a health care provider when a medical procedure or course of therapy produces unintended and harmful results or fails to produce

the positive results reasonably anticipated by the patient. These actions, often bearing the common appellation of "malpractice," differ in their underlying theory, in some of the elements that must be proved, and in the kind of damages that may be recovered. Most are tort-based, sounding either in battery or in negligence of one kind or another, and, occasionally, in misrepresentation or fraud; some are contract-based. When they are pursued either alternatively or in combination, care must be taken to keep the actions separate and not to allow the theories, elements, and recoverable damages to become improperly intertwined.

██ We have long recognized, as have most courts, that, except in those unusual circumstances when a doctor acts gratuitously or in an emergency situation, recovery for malpractice "is allowed only where there is a relationship of doctor and patient as a result of a contract, express or implied, that the doctor will treat the patient with proper professional skill and the patient will pay for such treatment, and there has been a breach of professional duty to the patient." *Hoover v. Williamson*, 236 Md. 250, 253, 203 A.2d 861, 862 (1964). The relationship that spawns the malpractice claim is thus ordinarily a contractual one. Largely because of the greater facility offered by tort-based actions for recovering damages for non-economic loss—predominantly pain, suffering, and disfigurement—malpractice actions have traditionally been tort-based, the tort arising from the underlying contractual relationship. *See Schaefer v. Miller*, 322 Md. 297, 587 A.2d 491 (1991).[1]

---

1. The issue in *Schaefer v. Miller* was whether punitive damages were recoverable in a medical malpractice action in the absence of actual malice on the part of the doctor. That issue was premised on the undisputed assumption that the malpractice action arose from a contractual relationship. The opinion cited was the opinion of three judges and was accompanied by a concurring opinion of three other judges. The disagreement among the judges, resolved later in *Owens–Illinois v. Zenobia*, 325 Md. 420, 601 A.2d 633, *reconsideration denied*, 325 Md. 665, 602 A.2d 1182 (1992), concerned only the circumstances under which punitive damages may be awarded and not the existence of a contractual relationship between the patient and doctor.

■ The traditional action has been for negligence in the performance (or non-performance) of a course of therapy or a medical procedure.[2] The negligence consists of the breach of the duty that a physician has "to use that degree of care and skill which is expected of a reasonably competent practitioner in the same class to which [the physician] belongs, acting in the same or similar circumstances." *Shilkret v. Annapolis Emergency Hosp.*, 276 Md. 187, 200, 349 A.2d 245, 252 (1975). To recover in such an action, the plaintiff must show that the doctor's conduct—the care given or withheld by the doctor— was not in accordance with the standards of practice among members of the same health care profession with similar training and experience situated in the same or similar communities at the time of the act (or omission) giving rise to the cause of action. *See* Maryland Code, § 3–2A–02(c) of the Courts and Judicial Proceedings Article. That action necessarily focuses on the manner in which the physician diagnosed and treated the patient's medical problem and, except as it may bear on other issues, such as contributory negligence, causation, or damages, not so much on what was told to the patient or what the patient's expectations may have been.

In *Sard v. Hardy*, 281 Md. 432, 379 A.2d 1014 (1977), we recognized, as a separate negligence-based (rather than battery-based) cause of action, the performance of a medical procedure by a physician without the informed consent of the patient.

In the course of her third pregnancy, the plaintiff, Ms. Sard, informed her gynecologist, Dr. Hardy, that, in light of her two previous pregnancies, which resulted in Caesarean section deliveries, she did not wish to become pregnant again and requested that she be sterilized. In an attempt to achieve that result, the doctor performed a bilateral tubal ligation in the course of delivering the third child by means of a Caesarean section. That procedure proved ineffective, however, and

---

2. We shall use the terms procedure, treatment, and therapy interchangeably. The case before us involves a surgical procedure, but the concepts discussed are not necessarily limited to that context.

Ms. Sard became pregnant for the fourth time. She sued Dr. Hardy for failing to inform her that (1) the tubal ligation might not succeed in preventing future pregnancies, (2) other sterilization procedures were available, (3) there were methods of performing a tubal ligation other than the one Dr. Hardy used, that had a lesser risk of failure, and (4) the procedure he used had a lesser risk of failure if not performed contemporaneously with a Caesarean section. The case raised, for the first time in Maryland, the nature of an action based on a lack of informed consent.

The underlying premises of an action for conducting a medical procedure without obtaining the patient's informed consent are that (1) the decision to undergo an elective medical procedure rests with the patient, who, if competent, retains the right to exercise control over his or her body, (2) a physician therefore has no right to subject a competent patient to a medical procedure without the patient's consent, (3) the patient will ordinarily be unable to make an intelligent decision whether to proceed without a clear and adequate explanation by the physician of the nature, benefits, and risks of, and alternatives to, the contemplated procedure, and (4) the physician therefore has a duty, before proceeding, to provide that explanation and obtain the patient's *informed* consent. We stated in *Sard:*

"Simply stated, the doctrine of informed consent imposes on a physician, before he subjects his patient to medical treatment, the duty to explain the procedure to the patient and to warn him of any material risks or dangers inherent in or collateral to the therapy, so as to enable the patient to make an intelligent and informed choice about whether or not to undergo such treatment."

*Id.* at 439, 379 A.2d at 1020. *See also Wright v. Johns Hopkins Health,* 353 Md. 568, 728 A.2d 166 (1999); *Faya v. Almaraz,* 329 Md. 435, 450 n. 6, 620 A.2d 327, 334 n. 6 (1993).

■ Unlike the traditional action of negligence, a claim for lack of informed consent focuses not on the level of skill exercised in the performance of the procedure itself but on the

adequacy of the explanation given by the physician in obtaining the patient's consent. In *Sard,* we adopted a "general," rather than a "professional" standard in that regard and, quoting from *Cobbs v. Grant,* 8 Cal.3d 229, 104 Cal.Rptr. 505, 502 P.2d 1, 10 (1972), we determined that the explanation "must be measured by the patient's need, and that need is whatever is material to the decision." Thus, we continued, "the test for determining whether a potential peril must be divulged is its materiality to the patient's decision." *Sard,* at 443–44, 379 A.2d at 1022.

Although, as in *Sard v. Hardy,* claims based on lack of informed consent usually involve allegations that the physician failed to make adequate disclosure of a material risk or collateral effect of the contemplated procedure or of an available alternative not carrying that risk or effect, the duty is not so limited. Risks, benefits, collateral effects, and alternatives normally must be disclosed routinely, but other considerations, at least if raised by the patient, may also need to be discussed and resolved. *See* Aaron D. Twerski & Neil B. Cohen, *The Second Revolution in Informed Consent: Comparing Physicians to Each Other,* 94 Nw. U.L.Rev. 1 (1999); *Johnson v. Kokemoor,* 199 Wis.2d 615, 545 N.W.2d 495 (1996). One of those considerations, in an expanding era of more complex medical procedures, group practices, and collaborative efforts among health care providers, may be who, precisely, will be conducting or superintending the procedure or therapy. This may be especially important with respect to surgical procedures, which usually involve collaboration between the chosen surgeon and other medical professionals who may be unknown to the patient. The physician, as Dr. Dingle indicated was the case here, may be unwilling to accept limitations on the actual performance of the surgery, but, if the identity of the persons who will be performing aspects of the surgery is important to the patient, the matter must be discussed and resolved.

Despite Dr. Dingle's protestation to the contrary, a physician who agrees to a specific allocation of responsibility or a specific limitation on his or her discretion in order to

obtain the consent of the patient to the procedure and then, absent some emergency or other good cause, proceeds in contravention of that allocation or limitation has not obtained the informed consent of the patient. We do not see this result as having the pernicious effects suggested by Dr. Dingle, of permitting patients to "choreograph" surgery and unduly restrict the flexibility that the surgeon must retain. Precisely as Dr. Dingle stated was the case here, the surgeon does not have to agree to any such limitations, and, presumably, few, if any, of them will so agree. The issue is raised only when there is a claim that such an agreement was made and, without good cause, violated.

Notwithstanding the existence of these tort-based actions, courts have universally recognized that, except in emergency or gratuitous situations, the relationship between doctor and patient is a contractual one, either expressly or by implication, and, from that premise, many have held that, as an alternative to tort-based actions, a separate action for breach of the contract may lie when the doctor acts in contravention of a contractual undertaking, at least in some settings. Those actions are often founded either on a. breach of warranty theory, alleging a warranty by the physician of a particular result, or on a promise independent of a medical procedure. For an example of the latter, see *Chew v. Meyer*, 72 Md.App. 132, 527 A.2d 828 (1987) (failure of doctor to perform agreement to complete and submit patient's medical insurance forms). In *Sard v. Hardy, supra*, 281 Md. 432, 451–52, 379 A.2d 1014, 1026–27, a breach of warranty claim was made, based on an alleged assurance by Dr. Hardy, *following* the surgery, that Ms. Sard was absolutely sterile and could not again become pregnant. We concluded that a patient *may* recover for breach of an express warranty or assurance of that kind under two circumstances: if the assurance was made before the medical procedure or, if made after the procedure, it was supported by separate consideration. *Id.* Ms. Sard was unable to recover because the assurance was made after the surgery and was not supported by any separate consideration.

Other States have allowed such actions. *See, for example, Robins v. Finestone*, 308 N.Y. 543, 127 N.E.2d 330 (1955), where an action *ex contractu* to recover the costs of remedial therapy and loss of income was allowed on a complaint that the defendant physician, employed to remove a growth by means of fulguration, expressly promised that he would perform the procedure in a good and workmanlike manner, that the plaintiff would be cured in one or two days, and that the plaintiff could resume work immediately thereafter. The New York court noted that, although it may be unusual for a physician to enter into an agreement to cure, rather than merely undertake to render his or her best skill, "a doctor and his patient are at liberty to contract for a particular result and, if that result be not attained, a cause of action for breach of contract results which is entirely separate from one for malpractice although both may arise from the same transaction." *Id.* at 331–32. Quoting from *Colvin v. Smith*, 276 A.D. 9, 92 N.Y.S.2d 794, 795 (1949), the court carefully distinguished between the two kinds of actions:

> "The two causes of action are dissimilar as to theory, proof and damages recoverable. Malpractice is predicated upon the failure to exercise requisite medical skill and is tortious in nature. The action in contract is based upon a failure to perform a special agreement. Negligence, the basis of the one, is foreign to the other. The damages recoverable in malpractice are for personal injuries, including the pain and suffering which naturally flow from the tortious act. In the contract action they are restricted to the payments made and to the expenditures for nurses and medicines or other damages that flow from the breach thereof."

*Robins, supra*, 127 N.E.2d at 332. *See also Stewart v. Rudner*, 349 Mich. 459, 84 N.W.2d 816, 822–23 (1957); *Zostautas v. St. Anthony De Padua Hospital*, 23 Ill.2d 326, 178 N.E.2d 303 (1961); *Scarzella v. Saxon*, 436 A.2d 358 (D.C.App.1981) and cases cited at 361; Jack W. Shaw, Jr., Annotation, *Recovery Against Physician on Basis of Breach of Contract to Achieve Particular Result or Cure*, 43 A.L.R.3d 1221 (1972).

Actions for breach of contract have been founded on a variety of alleged promises and commitments. Most have alleged a promise to cure, or to cure within a certain period of time, or of some other particular result. *See Robins v. Finestone, supra,* 308 N.Y. 543, 127 N.E.2d 330; *Giambozi v. Peters,* 127 Conn. 380, 16 A.2d 833 (1940); *Guilmet v. Campbell,* 385 Mich. 57, 188 N.W.2d 601 (1971); *Hawkins v. McGee,* 84 N.H. 114, 146 A. 641 (1929); *Noel v. Proud,* 189 Kan. 6, 367 P.2d 61 (1961); *Bailey v. Harmon,* 74 Colo. 390, 222 P. 393 (1924); *Sullivan v. O'Connor,* 363 Mass. 579, 296 N.E.2d 183 (1973). Others, such as *Stewart v. Rudner, supra,* 349 Mich. 459, 84 N.W.2d 816, have been based on a commitment to do a certain procedure, to deliver a child by means of a Caesarean section. *See,* in general, 4 FRED LANE, MEDICAL LITIGATION GUIDE, § 40.07.

We are unaware of any case precisely like this one, where the dispute is over an alleged allocation of specific functions between or among surgeons, all of whom were expressly authorized to participate and perform some role in the procedure. There have, however, been a number of cases in which a patient was informed that Dr. A would do the procedure, consented to Dr. A's performing the procedure, and later learned that the procedure was performed entirely or predominantly by Dr. B, with little or no participation by Dr. A. Liability has been found in those situations, but on different theories. In *Perna v. Pirozzi, supra,* 92 N.J. 446, 457 A.2d 431—the case relied upon by the Court of Special Appeals—the plaintiff gave a proper, informed consent for Dr. Pirozzi to operate upon him in order to remove kidney stones. Dr. Pirozzi was in a group practice with two other urologists. The surgery was performed entirely by the other two doctors; Dr. Pirozzi was not even present. All three doctors were sued, and, among other claims of negligence and battery, the plaintiff asserted the lack of informed consent—that the consent given was conditioned on Dr. Pirozzi performing the surgery. The claims against the two other doctors were treated as batteries—a non-consensual touching.

With respect to the claim against Dr. Pirozzi, the court noted that a patient "has the right to choose the surgeon who will operate and to refuse to accept a substitute," and that, "[c]orrelative to that right is the duty of the doctor to provide his or her personal services in accordance with the agreement with the patient." *Id.*, 92 N.J. 446, 457 A.2d at at 440. The failure to perform that duty, the court held, constitutes a deviation from standard medical care, for which the patient has an action for malpractice. It then addressed the proper form of action:

"Although an alternative cause of action could be framed as a breach of the contract between the surgeon and the patient, generally the more appropriate characterization of the cause will be for breach of the duty of care owed by the doctor to the patient. The absence of damages may render any action deficient, but the doctor who, without the consent of the patient, permits another surgeon to operate violates not only a fundamental tenet of the medical profession, but also a legal obligation." [3]

---

3. The court's conclusion regarding the violation of a medical tenet sprang from a number of formal statements or declarations of the American Medical Association and the American College of Surgeons. The court quoted at length American Medical Association Judicial Council Opinion 8.12 (1982) that "[t]o have another physician operate on one's patient without the patient's knowledge and consent is a deceit," that "[t]he patient is entitled to choose his own physician and he should be permitted to acquiesce in or refuse to accept the substitution," that "the surgeon's obligation to the patient requires him to perform the surgical operation: (1) within the scope of authority granted by the consent to the operation; (2) in accordance with the terms of the contractual relationship; (3) with complete disclosure of all facts relevant to the need and the performance of the operation; and (4) to utilize his best skill in performing the operation," that "[t]he surgeon, in accepting the patient is obligated to utilize his personal talents in the performance of the operation to the extent required by the agreement creating the physician-patient relationship," that the surgeon so chosen "cannot properly delegate to another the duties which he is required to perform personally," that the surgeon may use the services of assisting residents or other assisting surgeons to the extent necessary but that "[i]f a resident or other physician is to perform the operation under the guidance of the surgeon, it is necessary to make a full disclosure of this fact to the patient, and this should be evidenced by an appropriate statement contained in the consent," that, if the

*Id.*, 92 N.J. 446, 457 A.2d at 441. *Perna v. Pirozzi*, in other words, while recognizing a cause of action in that circumstance, treated the action against the doctor actually engaged to perform the surgery as preferably one of negligence, rather than as a breach of contract. Indeed, as Dr. Dingle points out, Dr. Pirozzi was not sued on a breach of contract theory.

In *Grabowski v. Quigley*, 454 Pa.Super. 27, 684 A.2d 610 (1996), *appeal granted*, 548 Pa. 670, 698 A.2d 594, *appeal dismissed*, 553 Pa. 75, 717 A.2d 1024 (1998), the patient, in need of back surgery, consented to the operation being performed by Dr. Quigley and reported to the hospital at the appointed time, prepared to be operated on by Dr. Quigley. He later learned that Quigley was not present at 8:15 a.m., when the anesthesia was administered and the operation was due to commence, that another surgeon, Dr. Bailes, was eventually summoned, that Dr. Bailes began the surgery at 10:20, and that Dr. Quigley showed up at 11:25 and participated to some extent thereafter until the operation ended at 12:30. The patient sued Dr. Bailes for battery and for negligence in the performance of the surgery, and he sued Dr. Quigley for negligence in the surgery, negligence in not being present, and breach of contract to perform the surgery in its

surgeon employed "merely assists the resident or other physician in performing the operation, it is the resident or other physician who becomes the operating surgeon," and that "[i]f the patient is not informed as to the identity of the operating surgeon, the situation is 'ghost surgery.'"

As Dr. Dingle points out, that 1982 opinion was updated in 1994. *See* American Medical Association Council on Ethical and Judicial Affairs CODE OF MEDICAL ETHICS (1998–99 ed.) Opinion 8.16. The new opinion drops the reference to "ghost surgery" and modifies somewhat the duty on the part of the surgeon to disclose the role that residents may play. The current version states, in relevant part, that *"[w]ith the consent of the patient*, it is not unethical for the operating surgeon to delegate the performance of certain aspects of the operation to the assistant provided this is done under the surgeon's participatory supervision, i.e., the surgeon must scrub. If a resident or other physician is to perform the operation under non-participatory supervision, it is necessary to make a full disclosure of this fact to the patient, and this should be evidenced by an appropriate statement contained in the consent." (Emphasis added).

entirety. Reversing summary judgments entered for the doctors, the court concluded that there was sufficient evidence presented to show that the alleged contract existed and that it was breached. The court rejected the argument that a breach of contract action would lie only on a special or express contract that Quigley alone would perform the surgery. Quoting from *Perna v. Pirozzi, supra,* the court held that a "basic tenet" of the contract between doctor and patient is "that the physician with whom the patient has contracted is obligated to perform the services." *Grabowski,* at 617. *See also Taylor v. Albert Einstein Medical Center,* 723 A.2d 1027 (Pa.Super.1998).

A breach of contract action was allowed in *Alexandridis v. Jewett,* 388 F.2d 829 (1st Cir.1968). The plaintiff engaged Drs. Jewett and Driscoll, who were partners, to treat her during her pregnancy and deliver the child. The doctors were aware that the plaintiff had a very soft cervix, which indicated a rapid delivery after the onset of labor. The evidence showed that, at 2:45 a.m., the plaintiff's husband called Dr. Jewett and informed him that the plaintiff was in labor. Jewett allegedly advised him to take the plaintiff immediately to the hospital and said that Dr. Driscoll, who was on duty that night, would meet them there. Jewett apparently informed the hospital, however, not to summon Dr. Driscoll until medication was necessary. The plaintiff arrived at 3:45 and was met by a first-year resident. Dr. Driscoll did not appear until after 5:00. In the meanwhile, the resident diagnosed fetal distress and delivered the baby. As part of the procedure, he performed an episiotomy and, in doing so, cut into the anal sphincter, leading ultimately to the patient suffering from chronic rectal incontinence. Reversing defendants' judgments, the appellate court, applying Massachusetts law, concluded that there was sufficient evidence of both negligence on the part of Jewett and Driscoll in not assuring Driscoll's presence earlier and of breach of contract.

The trial court had instructed the jury that, if Jewett and Driscoll, through a lack of diligence, abandoned the plaintiff by failing to meet the standard of their contract, they would be

responsible for any negligence on the part of the resident. The jury found no negligence on the part of the resident, however. On appeal, the plaintiff urged that liability for breach of contract did not depend on any third party's negligence, and the appellate court agreed, pointing out that, to condition contract liability on the negligence of the resident would deprive her of what she bargained for. She contracted for the delivery of her baby "by one of two highly skilled and experienced doctors, i.e., for specialized care," but what she received was "nothing more than an undertaking that the care provided would meet the ordinary standards of the community." The court continued:

> "If either Dr. Jewett or Dr. Driscoll had performed the operation, the standard of care would have been 'the care and skill commonly possessed and exercised by similar specialists in like circumstances.' [citations omitted] We cannot understand why a specialist should be subjected to a less onerous burden when he abandons an undertaking than when he attempts to fulfill it. We think the jury should have been instructed, as appellant requested, that if it found that the added skill possessed by Dr. Jewett and Dr. Driscoll would have avoided the injury, contract liability would result."

*Id.* at 833; *see also Forlano v. Hughes,* 393 Mass. 502, 471 N.E.2d 1315 (1984).

■ We draw a number of conclusions from this judicial landscape. Because the doctor-patient relationship is normally a contractual one, it is permissible for the parties, if they choose to do so, to define with some precision the role that the doctor is to play. The parties may well have conflicting interests in that regard—the doctor wanting as much flexibility and discretion as possible and the patient, if choosing the physician because of some special confidence in that physician's particular abilities, desiring that the selected physician oversee and personally perform the most difficult part of the procedure. As noted in footnote 3 above, the medical community itself recognizes the interest that the patient has in the matter and the need for disclosure and agreement if there is

likely to be a significant participation by other persons. The lack of a clear understanding prior to the procedure may well engender a later finding that informed consent was not obtained. A violation of an understanding so reached may constitute the lack of informed consent, negligent delegation, and a breach of the contract, not to mention the risk of a claim of misrepresentation or fraud. It would be prudent, of course, for the written consent form presented to the patient either to set forth any special understanding in this regard or note affirmatively that there is no such understanding.

■ The scenarios in which these claims can arise are too varied to attempt any complete analysis of how they all may relate, one to another. In the context of this case, it will suffice to say that a doctor who partially abandons his or her patient by improperly delegating to others professional tasks that the doctor was engaged personally to do and agreed personally to do may be liable for traditional professional negligence, lack of informed consent, and breach of contract, depending in part on the nature of the consequences that flow from that abandonment.

■ The problem for Ms. Belin in this case is that the one issue, common and central to both her claim of lack of informed consent and her claim for breach of contract was, in fact, submitted to the jury, which necessarily found against her. There was no question as to how the surgery proceeded—what Dr. Dingle did and what Dr. Magnuson did; nor was there any claim by Ms. Belin that Dr. Dingle failed to advise her of material risks, of collateral consequences, or of alternative therapies.[4] The only issue, as to both the informed consent and breach of contract claims, was whether Dr. Dingle ever agreed to the allocation of functions claimed by Ms.

---

4. There was some dispute over whether Dr. Dingle informed Ms. Belin about the prospect of having to switch from a laparoscopic procedure to a larger abdominal incision, but that did not occur, at least with respect to the cholecystectomy. Part of the claim of negligence in the performance of the surgery was the failure of Drs. Dingle and Magnuson to terminate the laparoscopic approach and proceed by making a larger incision. The jury, as noted, found against her on that claim.

Belin.  As noted, plaintiff's counsel made clear to the jury, in the context of the informed consent claim, that, to render a defendants' verdict, the jury would have to disbelieve Ms. Belin's version of her conversation with Dr. Dingle.  It obviously did so.  The breach of contract claim asserted by Ms. Belin could not survive in the face of that finding.

JUDGMENT OF COURT OF SPECIAL APPEALS VACATING JUDGMENT OF CIRCUIT COURT ON BREACH OF CONTRACT CLAIM REVERSED; CASE REMANDED TO COURT OF SPECIAL APPEALS WITH INSTRUCTIONS TO AFFIRM JUDGMENT OF CIRCUIT COURT; COSTS IN THIS COURT AND IN COURT OF SPECIAL APPEALS TO BE PAID BY RESPONDENT.